%JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Elizabeth D. by and through her Parents, Tina and Carl D., and Tina and Carl D., individually

## DEFENDANTS

Colonial School District

| | |
|---|---|
| **(b)** County of Residence of First Listed Plaintiff    Montgomery <br> (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant    Montgomery <br> (IN U.S. PLAINTIFF CASES ONLY) <br> NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE <br> LAND INVOLVED. |
| **(c)** Attorney's (Firm Name, Address, and Telephone Number) <br> Catherine Merino Reisman, Reisman Carolla LLP, 19 Chestnut St., Haddonfield, NJ 08033 -- 854.354.0071 | Attorneys (If Known) <br> Sharon W. Montanye, Sweet, Stevens, et al., 331 E. Butler Av., New Britian, PA 18901 -- 215.345.9111 |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 151 Medicare Act <br> ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | **PERSONAL INJURY** <br> ☐ 310 Airplane <br> ☐ 315 Airplane Product Liability <br> ☐ 320 Assault, Libel & Slander <br> ☐ 330 Federal Employers' Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle Product Liability <br> ☐ 360 Other Personal Injury | **PERSONAL INJURY** <br> ☐ 362 Personal Injury - Med. Malpractice <br> ☐ 365 Personal Injury - Product Liability <br> ☐ 368 Asbestos Personal Injury Product Liability <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal Property Damage <br> ☐ 385 Property Damage Product Liability | ☐ 610 Agriculture <br> ☐ 620 Other Food & Drug <br> ☐ 625 Drug Related Seizure of Property 21 USC 881 <br> ☐ 630 Liquor Laws <br> ☐ 640 R.R. & Truck <br> ☐ 650 Airline Regs. <br> ☐ 660 Occupational Safety/Health <br> ☐ 690 Other <br> **LABOR** <br> ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 730 Labor/Mgmt.Reporting & Disclosure Act <br> ☐ 740 Railway Labor Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal 28 USC 157 <br> **PROPERTY RIGHTS** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 840 Trademark <br> **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) <br> **FEDERAL TAX SUITS** <br> ☐ 870 Taxes (U.S. Plaintiff or Defendant) <br> ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 400 State Reapportionment <br> ☐ 410 Antitrust <br> ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and Corrupt Organizations <br> ☐ 480 Consumer Credit <br> ☐ 490 Cable/Sat TV <br> ☐ 810 Selective Service <br> ☐ 850 Securities/Commodities/ Exchange <br> ☐ 875 Customer Challenge 12 USC 3410 <br> ☐ 890 Other Statutory Actions <br> ☐ 891 Agricultural Acts <br> ☐ 892 Economic Stabilization Act <br> ☐ 893 Environmental Matters <br> ☐ 894 Energy Allocation Act <br> ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | **CIVIL RIGHTS** <br> ☐ 441 Voting <br> ☐ 442 Employment <br> ☐ 443 Housing/ Accommodations <br> ☐ 444 Welfare <br> ☐ 445 Amer. w/Disabilities - Employment <br> ☐ 446 Amer. w/Disabilities - Other <br> ☒ 440 Other Civil Rights | **PRISONER PETITIONS** <br> ☐ 510 Motions to Vacate Sentence <br> **Habeas Corpus:** <br> ☐ 530 General <br> ☐ 535 Death Penalty <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition | **IMMIGRATION** <br> ☐ 462 Naturalization Application <br> ☐ 463 Habeas Corpus - Alien Detainee <br> ☐ 465 Other Immigration Actions | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice <br> ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
20 U.S.C. 1400, et seq., 29 U.S.C. 794, 42 U.S.C. 12131 et seq.

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE        DOCKET NUMBER

DATE
10.20.09

SIGNATURE OF ATTORNEY OF RECORD
cur leig

### FOR OFFICE USE ONLY

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to approprite calendar.

Address of Plaintiff: c/o Catherine Merino Reisman, Reisman Carolla LLP, 19 Chestnut Street, Haddonfield, NJ 08033

Address of Defendant: 230 Flourtown Road, Plymouth Meeting, PA 19462

Place of Accident, Incident or Transaction: Montgomery County, PA
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
  (Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))      Yes ☐  No ☐

Does this case involve multidistrict litigation possibilities?      Yes ☐  No ☐
*RELATED CASE, IF ANY:*
Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
      Yes ☐  No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
      Yes ☐  No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
      Yes ☐  No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
      Yes ☐  No ☐

**CIVIL: (Place ✔ in ONE CATEGORY ONLY)**

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☑ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify)

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify)

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Catherine Merino Reisman, counsel of record do hereby certify:
  ☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
  ☒ Relief other than monetary damages is sought.

DATE: 10.20.2009        _Reisman_        57473
             Attorney-at-Law        Attorney I.D.#
**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 10.20.2009        _Reisman_        57473
             Attorney-at-Law        Attorney I.D.#

CIV. 609 (6/08)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Elizabeth D. by and through her Parents, | : | CIVIL ACTION |
| Tina and Carl D., and Tina and Carl D., | : | |
| Individually, | : | |
| v. | : | |
| Colonial School District | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (✗)

| 10.20.2009 | Coreill\_\_\_ | Plaintiffs |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 856.354.0071 | 856-873-5640 | creisman@reismancarolla.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Elizabeth D., by and through her Parents, Tina and Carl D., and Tina and Carl D., individually, Plaintiffs,<br><br>v.<br><br>Colonial School District,<br>Defendant. | 09-cv |

**COMPLAINT**

## INTRODUCTION

1.  Plaintiffs, Elizabeth D. ("Elizabeth") and her Parents Tina D. and Carl D. ("Parents") bring this action due to (1) the failure of the Colonial Area School District ("District" or "Defendant") to provide a free and appropriate public education ("FAPE") to Elizabeth as required by the Individuals with Disabilities Education Act, 34 U.S.C. § 1401 *et seq.* ("IDEA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* and (2) the District's interference with Plaintiffs' federally protected rights and retaliation in violation of Section 504 and Title II of the ADA.  Parents bring this action on behalf of themselves and their daughter.

2.  On March 2, 2009, Plaintiffs requested a special education due process hearing pursuant to 34 C.F.R. §§ 300.507(1) and 300.508 and 22 Pa. Code 14.162, seeking relief pursuant to IDEA and Section 504.

3.  At the hearing, Plaintiffs sought compensatory education from March, 2007 through August, 2009 alleging that (1) the District failed to evaluate and identify Elizabeth in all areas of suspected disability during the 2006-2007 school year and (2) the District did not provide an appropriate program and placement during the 2007-2008 school year.[1]

4.  On August 29, 2009, the Special Education Hearing Officer rejected Plaintiffs' requests for relief.  Redacted Opinion of Pennsylvania Hearing Officer, dated August 29, 2009 ("*Op.*", attached hereto as Exhibit 1).  Plaintiffs bring this action requesting review

---

[1] Plaintiffs also sought tuition reimbursement for the 2008-2009 school year but are not pursuing that claim at this time.

and reversal of the Hearing Officer's decision regarding compensatory education. Plaintiffs also seek compensatory damages as well as reasonable attorney's fees and costs under IDEA, Section 504, and the ADA.

## PARTIES

5.   Elizabeth resides with her Parents within the boundaries of the District.  Elizabeth is a student eligible for special education services.  *Op.* at 3 ¶ 1.  Elizabeth is a "child with a disability" within the meaning of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1402(3)(A), 34 C.F.R. § 300.8, and a "qualified individual with a disability" within the meaning of § 504 of the Rehabilitation Act ("Section 504" or "Rehabilitation Act"), 29 U.S.C. § 705(20) and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104.

6.   Elizabeth's Parents have a "legally cognizable interest in [Elizabeth's] education. . . . Congress has found that 'the education of children with disabilities can be made more effective by . . . strengthening the role and responsibility of parents and ensuring that families of such children have meaningful opportunities to participate in the education of their children at school and at home.'"  *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 534 (2007) (citing 20 U.S.C. § 1400(c)(5)).

7.   The District is a local educational agency ("LEA") within the meaning of 20 U.S.C. § 1401(15), 34 CFR § 300.28, 22 Pa. Code 14.102(a)(2)(vii), a federal funds recipient within the meaning of IDEA, 20 U.S.C. § 1401 and Section 504, 29 U.S.C. § 794(b)(2)(B), and a public entity as defined in the ADA, 42 U.S.C. § 12131(1), 28 C.F.R. § 35.104.

## JURISDICTION AND VENUE

8.   This Court has original jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

9.   Plaintiffs have exhausted their administrative remedies under 20 U.S.C. § 1415(i).

10. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## STATUTORY AND REGULATORY BACKGROUND

11. The purpose of IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

2

12. IDEA and its regulations establish procedures by which school districts and Parents, working together, develop an appropriate Individualized Education Program ("IEP") of special education and related services to address the educational needs of a child with disabilities. A child's IEP must provide "significant learning" and "meaningful benefit." *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999).

13. Pennsylvania special education regulations in effect during Elizabeth's Kindergarten year required that each school district establish a system of screening to identify and provide initial screening for students prior to referral for a special education evaluation. *See Op.* at 10 (quoting 22 Pa. Code § 14.122) (available at 31 Pa. Bull. 3021 (June 9, 2001), relevant pages attached hereto as Exhibit 2). The regulations mandated screening either through the instructional support process established by the Pennsylvania Department of Education or through a comprehensive process in accordance with the regulations.

14. The Pennsylvania IST process required that each school district establish a system of screening to accomplish the following:

     a. For students with academic concerns, an assessment of the student's functioning in the curriculum including curriculum-based or performance-based assessment;
     b. For students with behavioral concerns, a systematic observation of the student's behavior in the classroom or area in which the student is displaying difficulty;
     c. An intervention based on the results of [the assessments];
     d. Activities designed to gain the participation of parents.

31 Pa. Bull. 3021, 3026 (22 Pa. Code § 14.122(c)(1), (2), (3), (7)); *Op.* at 10-11.

15. The regulations specifically emphasize parental participation (22 Pa. Code § 14.122(c)(7)) in response to concerns expressed during the rulemaking process. See 31 Pa. Bull. at 3021 ("Commentators, the House Education Committee and [the Independent Regulatory Review Commission] asked that provisions be added to the screening process requirements that would involve parents in this process").

16. The regulations in effect at the time Elizabeth went through the IST process provided that if screening activities produced little improvement within 60 school days after initiation, the student "shall be referred for evaluation § 14.123 (relating to evaluation)." 31 Pa. Bull. 3021, 3026 (22 Pa. Code § 14.122(d)).

17. IDEA and its implementing regulations require that school districts evaluate all children suspected of needing special education services in all areas of suspected need. 20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 200.204(c)(4). The evaluation must be

3

sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified.  34 C.F.R. § 300.304(c)(6).

18. An appropriate comprehensive evaluation provides the foundation for an appropriate IEP.  An incomplete evaluation necessarily yields an inappropriate IEP.  "If the [evaluation] and/or IEP are incomplete, then a correct placement cannot be made and the student has been denied [a free appropriate public education ("FAPE")]."  *East Penn Sch. Dist. v. Scott B.*, 1999 U.S. Dist. Lexis 2683, at *17 n.6 (E.D. Pa. Feb. 23, 1999), *aff'd without op.*, 213 F.3d 638 (3d Cir. 2000).

19. The IEP is the centerpiece of the education delivery system for children with disabilities.  "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide."  *Schaffer v. Weast*, 546 U.S. 49, 53 (2005).

20. "Education" extends beyond academic skills and also includes social, emotional and physical progress necessary to move the child toward independence and self-sufficiency.  An appropriate IEP must offer a child the opportunity to make "meaningful" progress in all relevant domains, including behavioral, social and emotional.

21. Extended school years ("ESY") are special education and related services provided to a child with a disability beyond the normal school year at no cost to the Parents.  A school district must, at each IEP meeting for a student with disabilities, determine whether the student is eligible for ESY services.

22. Pennsylvania regulations require that the IEP Team consider the following factors when determining ESY eligibility.  No single factor is determinative:

    a.  Regression/recoupment.

    b.  Extent to which the student has mastered and consolidated an important skill or behavior at the point when educational programming would be interrupted.

    c.  Extent to which a skill or behavior is particularly crucial for the student to meet the IEP goals of self-sufficiency and independence from caretakers.

    d.  Extent to which successive interruptions in educational programming result in a student's withdrawal from the learning process.

23. In the context of education, the Third Circuit Court of Appeals has observed that there are few differences, if any, between IDEA's affirmative duty and the substantive

prohibitions of Section 504 and the ADA.  Thus, a denial of FAPE and procedural rights violates Section 504 and the ADA, as well as IDEA.

**STANDARD OF REVIEW**

24.  In reviewing the Opinion below, this Court:

> must make its own findings by a preponderance of the evidence, 20 U.S.C. § 1415 (i)(2)(B)(iii), [and] must also afford "due weight" to the [Hearing Officer]'s determination. . . . Under this standard, "factual findings from the administrative proceedings are to be considered prima facie correct," and "if a reviewing court fails to adhere to them, it is obliged to explain why." . . . . In addition, if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight. . . .  Specifically, this means that a District Court must accept the state agency's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." . . . In this context the word "justify" demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court.

*Shore Reg'l Sch. Dist. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

25. The district court owes no deference to conclusions of law drawn by the Hearing Officer.  *J.R. v. Mars Area Sch. Dist.*, 318 Fed. Appx. 113, 118 (3d Cir. 2009) (unpublished opinion).

**FACTS**

26. Elizabeth began attending the District in 2006-2007 for her Kindergarten year. *Op.* at 1.

27. The Hearing Officer erred as a matter of law in concluding that the District complied with its "child find" obligation during the 2006-2007 school year.  The facts in support of this assertion of legal error are either findings of fact made by the Hearing Officer or are reflected in non-testimonial, extrinsic evidence, and are as follows:

   a. The Hearing Officer found that Elizabeth made "significant progress" based on her Kindergarten report card and her Mother's testimony that "she had come a long way."

      i. As a matter of law, Elizabeth's mother's subjective statement cannot support a finding of appropriate progress.

      ii. Further, non-testimonial extrinsic evidence (Elizabeth's report card) establishes that Elizabeth did not make "significant progress" in Kindergarten.  In 31 academic areas assessed, Elizabeth began the year "proficient" in 5 areas.  As illustrated by the following chart, in the remaining 26 areas, Elizabeth completed the school year with a grade of PR (for proficient) in 4

5

areas or 15% of the areas assessed.  She showed no
improvement in 18 areas or 69% of the areas assessed.  This
non-testimonial, extrinsic evidence does not support the Hearing
Officer's finding of "significant progress" and does not establish
"meaningful educational benefit."

|  | **Areas of Assessment** |
|---|---|
| NO IMPROVEMENT – REMAINED PP (partially proficient) | 1. Recognizes concepts of letters, words, sentences, left to right<br>2. Uses illustrations and text to make logical inferences and predictions<br>3. Uses personal experience to write complete thoughts<br>4. Uses sound spelling to represent words<br>5. Writes using punctuation<br>6. Reads own writing using 1:1 correspondence<br>7. Contributes ideas relevant to discussion<br>8. Describes and compares data presented in a bar graph or pictograph |
| NO IMPROVEMENT - REMAINED NP (not proficient) | 1. Generates rhyming words<br>2. Orally segments sounds in words<br>3. Writes using correct spacing<br>4. Writes using upper/lower case letters<br>5. Applies one to one correspondence<br>6. Uses nonstandard units to measure real objects<br>7. Understands the spatial concepts of above/below, beside/between/next to and inside/outside<br>8. Recognizes, describes, extends and replicates simple patterns<br>9. Recognizes and names two-dimensional geometric shapes<br>10. Sequences a group of given numbers |
| IMPROVEMENT to Proficient or Partially Proficient | 1. Identifies lowercase letters (*PR*)<br>2. Uses high frequency words when reading patterned text (PP)<br>3. Retells a known story in sequence (*PR*)<br>4. Uses high frequency words when writing (PP)<br>5. Identifies numerals 0 to 20 (*PR*)<br>6. Uses pictures or concrete objects to represent a number (PP)<br>7. Understands vocabulary to compare measurable characteristics of different objects (PP)<br>8. Understands concepts of yesterday, |

| | today and tomorrow (*PR*) |
|---|---|

     iii.  Elizabeth finished the end of her Kindergarten year with an instructional Rigby reading level of 0, which is considered "not proficient" for Kindergarten.  S-4 at 5; S-27 at 11.

b.  The Hearing Officer erred as a matter of law in concluding that the District satisfied its child find obligation and appropriately deferred assessment in all areas of suspected need pending continued instructional support interventions even after 60 school days had passed.  *Op.*, at 13 ("when interventions are put in place, it takes some time to determine their effectiveness, including whether small adjustments will result in improvement"):

     i.  Elizabeth's Kindergarten teacher and Elizabeth's Parents expressed concerns about Elizabeth's academic skills early in her Kindergarten year (2006-2007).  *Op.* at 1, FF 1, 3.

     ii.  On October 20, 2006, Elizabeth's teacher referred her to the Student Support Team ("SST") because Elizabeth was struggling behaviorally and academically.  S-15.

     iii.  The SST "screens children in the early elementary years who are struggling with school-related skills and develops strategies to support the classroom teacher in addressing the identified needs within the classroom."  *Op.* at 5, FF 19.

     iv.  In the referral form, which was not provided to Parents at the time it was completed, Elizabeth's teacher identified the following areas of need:
        1.  inability to keep up with the Kindergarten curriculum;
        2.  inability to write her name or other letters of the alphabet;
        3.  struggles in Math, including having trouble recognizing and writing numbers and difficulty with one-to-one number correspondence;
        4.  behavioral challenges, including difficulty beginning tasks, remaining on task, completing tasks, and exhibiting immature behaviors when compared with her peers.  S-15.

     v.  Elizabeth's teacher submitted the referral form to the SST on October 20, 2006.  S-21 at 1.  On November 9, 2006, the SST met (without Parents) and suggested one intervention: Kidwriting.  S-15; S-21 at 1.  The SST also referred her for speech and occupational therapy screenings.  *Op.* at 6, FF 22.

     vi.  As a matter of law, pursuant to state and federal regulations, Elizabeth should have been referred for evaluation within 60 school days of the commencement of the SST process, or October 20, 2006.  Sixty school days after October 20, 2006 was on or about January 13, 2007.  At that point, the District should have assessed Elizabeth *in all areas* related to her suspected

disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities.  Instead, the District limited the evaluation in January, 2007 to speech and language.  The District did not initiate a multi-disciplinary evaluation until April, 2007.

vii.   The Hearing Officer acknowledged that initial evaluation, completed in January, 2007, did not assess Elizabeth in all areas of suspected disability.  As a result of the District's failure to evaluate Elizabeth in all areas of suspected need in a timely manner, the initial evaluation report in March 2007, limited to speech/language, was not appropriate.  The initial IEP, offered in April 2007, was also not appropriate because it was based upon an inappropriate evaluation.

viii.   In rejecting Parents' contention that the District's failure to involve Parents in the screening process was a denial of FAPE, the Hearing Officer cited 34 C.F.R. § 300.513, and stated:  "A determination that FAPE was denied must be based on substantive grounds."  According to the Hearing Officer, because there was no "deprivation of educational benefit," there was no substantive ground for the determination that the District denied a FAPE to Elizabeth.  *Op.* at 12.  However, as discussed herein, the District did deprive Elizabeth of educational benefit.  Further, even if the Hearing Officer were correct that there was no deprivation of educational benefit, the exclusion of Parents, *in and of itself*, provides a substantive ground for concluding that there was a denial of FAPE.

1.   The regulation upon which the Hearing Officer relied, 34 C.F.R. § 300.513(a), states:

(1) *Subject to paragraph (a)(2) of this section*, a hearing officer's  determination of whether a child received FAPE must be based on substantive grounds.

(2) In matters alleging a procedural violation, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies--

(i) Impeded the child's right to a FAPE;

*(ii) Significantly impeded the parent's opportunity to participate in* the decision-making process regarding the provision of a FAPE to the parent's child; **or**

(iii) Caused a deprivation of educational benefit.

2.   The regulation specifically finds that a procedural violation is a denial of FAPE if there is ***either*** deprivation of educational benefit ***or*** a significant impediment to parental participation.  The procedural violation here was excluding parents from the screening process in violation of Pennsylvania regulations, which necessarily significantly impeded Parents' opportunity to participate in the decision-making process regarding Elizabeth's education.

8

3. Because she failed to take into account 34 C.F.R. § 300.513(a)(2)(ii), the Hearing Officer committed an error of law in concluding that the procedural violation here did not result in a denial of FAPE during the 2006-2007 school year.

28. The Hearing Officer erred as a matter of law in concluding that the District appropriately denied extended school year ("ESY") services to Elizabeth in the Summer of 2007. The facts in support of this assertion of legal error are either findings of fact made by the Hearing Officer or are reflected in non-testimonial, extrinsic evidence, and are as follows:

a. Non-testimonial extrinsic evidence establishes that the District did not consider Elizabeth for ESY services for the Summer of 2007 because she had a speech-only IEP. Specifically, Mrs. Quaco wrote that, notwithstanding Elizabeth's lack of progress in reading, "she could not be considered for ESY services in reading, because she was not a student with an IEP for reading at this time." S-21 at 3. Elizabeth was a student with a speech only IEP because the District had failed to evaluate her in all areas of suspected disability.

b. Non-testimonial extrinsic evidence establishes that Elizabeth was not eligible for the District reading programs because, by the end of Kindergarten, she was not even partially proficient in reading. Mrs. Quaco wrote, "Qualifications to attend these two programs are determined by the Language Arts department. The programs are funded by money that is made available to bring students who are partially proficient in reading up to proficiency. They are not ESY programs or special education programs . . . Elizabeth's reading skills were too low to be considered partially proficient, which was the qualifier for the program." Thus, Elizabeth could not receive special education services in reading for the Summer of 2007 because the District had failed to identify her reading disability and she could not receive remedial reading instruction available to regular education students because her ability level was below that of the students who were qualified for remedial reading.

c. Given these facts, non-testimonial extrinsic evidence contradicts the Hearing Officer's conclusion that Elizabeth made appropriate progress during her Kindergarten year and did not need ESY services during the Summer of 2007.

29. The Hearing Officer erred as a matter of law in concluding that Elizabeth received appropriate services in First Grade (the 2007-2008 school year). The facts in support of this assertion of legal error are either findings of fact made by the Hearing Officer or are reflected in non-testimonial, extrinsic evidence, and are as follows::

a.   The Hearing Officer acknowledged that the Learning Support teacher, without conducting a functional behavioral assessment and without involving Parents, developed and implemented her own "behavior interventions." *Op.* at 7, ¶ 32.  Non-testimonial extrinsic evidence supports the conclusion that Parents were excluded from the process by which the Learning Support Teacher addressed behavior problems.  S-21 at 3-4.

b.   Non-testimonial extrinsic evidence in the record contradicts the Hearing Officer's conclusion that the behavior interventions created without parental input or knowledge were appropriate.  Specifically, in a document created in response to the Due Process Complaint (S-21), Elizabeth's Learning Support Teacher Mrs. Quaco reported that Elizabeth's behavior for the entire 2007-2008 school year "had a huge impact upon her instruction, since I could not complete lessons and activities in a timely way with her when she refused to cooperate."  S-21 at 5; *see also* S-21 at 3-4 (Elizabeth's use of noncompliance as a way to escape from demands "had a huge impact upon her instruction").  In addition, Mrs. Quaco's notes indicate that there was no objective data collection related to Elizabeth's problematic behaviors.  S-21 at 3.  *See Lauren P. v. Wissahickon Sch. Dist.*, 310 Fed. Appx. 552, 554 (3d Cir. 2009) (compensatory education appropriate where district "(1) knew or should have known that Lauren's behavioral problems were impeding her education, (2) recognized that the IEP was inadequate, and (3) addressed[the student's] behavior in a piecemeal fashion rather than through a consistent  behavior management plan").

c.   Non-testimonial extrinsic evidence in the record contradicts the Hearing Officer's conclusion that Elizabeth made "appropriate progress" in First Grade.  When evaluated with a normed, standardized instrument (the Qualified Reading Inventory) at the end of the 2007-2008 school year, Elizabeth was still at a pre-primer level.  P-1 at 86.  Pre-primer is the lowest level on the QRI.  Thus, after two years of instruction, Elizabeth had made no progress.  The only evidence of "progress" in reading were subjective assessments by her Learning Support teacher which were not consistent with the QRI.

d.   The Hearing Officer acknowledged that Elizabeth had occupational therapy needs (related to sensory integration and handwriting strategies) during the 2007-2008 school year.  *Op.* at 7, FF 35, 36. However, the District did not evaluate her in these areas until the Summer of 2008, at Parents' insistence.  S-12.  Non-testimonial extrinsic evidence in the record establishes that the IEP in effect during the 2007-2008 school year did not adequately address all of Elizabeth's OT needs (which were not identified until the Summer of 2008 because of the District's inappropriate evaluation).

e.   The "extensive notes and progress monitoring data" referenced by the Hearing Officer in support of her conclusion that Elizabeth made progress were never shared with Parents during the school year and were subjective assessments of her Learning Support teacher.

f.  Elizabeth had no social skills goals. *Op.* at 7, FF 34. Accordingly, there was no baseline data and objective progress reporting. Further, the Hearing Officer found that Elizabeth "remained immature in comparison to her 1st grade classmates, prompting consideration of whether her 2nd grade regular education inclusion should with with 1st or 2nd grade during the 2008/2009 school year." *Id.* The facts therefore do not support the legal conclusion that Elizabeth made appropriate progress in the area of social skills.

g.  Non-testimonial extrinsic evidence establishes that the reading program Elizabeth attended in the Summer of 2008 was not a special education program and contradicts the Hearing Officer's conclusion that Elizabeth benefitted from that program.

h.  The Hearing Officer found as a fact that the occupational therapy evaluation consisting of the Sensory Integration and Praxis Test ("SIPT") was not completed until the Summer of 2008, at Parents' request. *Op.* at 5, FF 17. The Hearing Officer found: "The test results indicated that Elizabeth's greatest problems were in areas with higher visual components such as spatial visualization, design copying, manual form perception and figure-ground discrimination. School-related recommendations based upon the SIPT results included preferential seating, decreasing distractions, repetition of directions, heightened sensory feedback, swivel chair, sensory processing activities, lare movement sensory breaks." *Id.* Because of the District's delay in conducting a SIPT evaluation, Elizabeth did not receive appropriate OT supports during the 2006-2007 school year. Although the Hearing Officer cited to the fact that the teacher "consulted" with an Occupational Therapist who was in the class for other students, Parents were not involved in that process and there were no baselines, goals, or objectives related to Elizabeth's extensive occupational therapy needs.

i.  Non-testimonial extrinsic evidence, in the form of a functional behavioral assessment that Mrs. Quaco began filling out in June, 2008, indicates that Elizabeth had several behaviors that impacted her ability to access her education, including
    i.   "Tendency to speak and act in babyish dependent type manner, with behavior typical of children younger than her actual age"
    ii.  "Will not join group activities: is a passive and reluctant participant in these activities"
    iii. "Often refuses to do work, complete an activity, or cooperate with directions, *i.e.* will not read her journal entry to the teacher, will not read from the book being read"
    iv.  Has difficulty remaining in her chair and working at a pace that is consistent with the teacher's instruction"

j.  Non-testimonial extrinsic evidence, in the form of an email from Mrs. Quaco, indicates that Elizabeth's behavior impeded her ability to access her education. Specifically, Mrs. Quaco stated, "We also need to realize that Elizabeth came into this classroom in the fall of 2007 refusing to do

her work much of the time.   *She received less than normal instructional time in the fall* because" of her behaviors.

30. The Hearing Officer erred as a matter of law in concluding that Elizabeth "made slow but steady progress and was able to derive meaningful benefit from her education." *Op.* at 14.   The facts in support of this assertion of legal error are either findings of fact made by the Hearing Officer or are reflected in non-testimonial, extrinsic evidence, and are as follows:

    a.  The non-testimonial extrinsic evidence establishes that the only objective measures used to assess Elizabeth's reading level showed no progress whatsoever.  At the end of First Grade, the District's reading specialist reported that Elizabeth remained at the pre-primer level after two years of instruction.  There is no level lower than pre-primer.

    b.  The non-testimonial extrinsic evidence establishes that by February, 2008, Elizabeth was not making progress either behaviorally or academically.  Mrs. Quaco, in an email to the school psychologist stated that Elizabeth "cannot even handle the social demands of first grade and with her level of academics as well as her immaturity, I feel she should be with first graders again next year. We do not retain in special ed, but I need to find out if a parent can request that their child stay for another year with first graders for social/immaturity reasons . . . . Elizabeth is tracking print inconsistently, knows about half the kindergarten level sight words, and is being instructed at a level A or B (she passed the A level in Rigby, but I think it is probably because she has it memorized by now).  In writing, she is partially proficient at a K level on a dictated sentence, but her first grade writing assessment is not proficient.  In math she is somewhere between K and 1st grade in her proficiencies."

    c.  The 2007-2008 IEP provided minimal information as to Elizabeth's present levels or performance.  Thus, there could be no objective evaluation of progress at the end of the school year.  Further, to the extent any objective testing was done, it indicated a lack of progress.

31. The Hearing Officer erred as a matter of law in relying upon the "progress reporting" identified by Learning Support Teacher Deb Quaco to find that Elizabeth made meaningful progress.  The factual allegations underlying this assertion of legal error are as follows:

    a.  On December 15, 2008, Parents (through counsel) submitted a comprehensive request for records including, among other things: "Progress reports, report cards, grades and comments generated by teachers or service providers other than teacher; teacher file(s) and records: notes, anecdotal notes, logs, curriculum based assessments, etc. (including all general classes or subjects and special education), Grade sheets maintained by all teachers (redacted if necessary for sheets

with multiple students); Goals and objectives, copies with data or progress marked, data upon which progress ratings are based.

b. Federal regulations implementing IDEA require that school districts "must permit parents to inspect and review any education records relating to their children that are collected, maintained, or used by the agency under this part. The agency must comply with a request without unnecessary delay and before any meeting regarding an IEP, or any hearing pursuant to § 300.507 or §§ 300.530 through 300.532 . . . and in no case more than 45 days after the request has been made."

c. The District did not provide the "progress monitoring" to Parents during the 2007-2008 school year, thereby significantly impeding Parents' ability to participate meaningfully in their daughter's education. The District also did not provide this "progress monitoring" to Parents in response to the records request. Accordingly, the Hearing Officer erred as a matter of law in relying upon the progress monitoring.

32. The District's refusal to allow Parents' expert access to the Learning Support program significantly impaired Parents' ability to exercise their procedural rights, as follows:

a. The District agreed that Plaintiffs' expert, Dr. Cane, a neuropsychologist and Pennsylvania and nationally certified school psychologist, was qualified to conduct an evaluation of the program.

b. On December 7, 2008, the District informed Parents that it would not allow Dr. Cane to observe the program that had been proposed for Elizabeth, stating, in an e-mail from counsel:

> Had we known that the intention of Dr. Cane's visit was for the purpose of developing an expert report for litigation purposes and not to develop an IEE, we likely would not have been so accommodating. The District has no legal obligation to provide access to programs and placements that have already been rejected by the parents. It was our understanding that the purpose of Dr. Cane's visit was to assist the parents in understanding how the District could address the student's needs as he understood them to exist. Since the purpose of his visit is to develop an expert report on a program already rejected, on behalf of the District, we are revoking the District 's permission to allow Dr. Cane to visit the school.

c. In Schaffer *v. Weast*, 546 U.S. 49 (2005), the Supreme Court held that Parents must bear the burden of proof in hearings to determine the appropriateness of an educational program. The Court held that this was fair to Parents because of the procedural protections in IDEA:

> School districts have a "natural advantage" in information and expertise, but Congress addressed this when it obliged schools to

safeguard the procedural rights of parents and to share information with them. *See School Comm. of Burlington v. Department of Ed. of Mass.*, 471 U.S. 359, 368 (1985). As noted above, parents have the right to review all records that the school possesses in relation to their child. §1415(b)(1). They also have the right to an "independent educational evaluation of the[ir] child." *Ibid*. The regulations clarify this entitlement by providing that a "parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." 34 CFR § 300.502(b)(1) (2005). *IDEA thus ensures parents access to an expert who can evaluate all the materials that the school  must make available, and who can give an independent opinion. They are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition.*

546 U.S. at 60-61.

## COUNT I
## IDEA, SECTION 504, and THE ADA
## APPEAL FROM HEARING OFFICER'S DECISION
## DENIAL OF FAPE

33.   Plaintiffs incorporate ¶¶ 1 through 32 as if set forth fully herein.

34.   As described more fully, *supra*, the Hearing Officer committed legal error in concluding that the District provided Elizabeth with a free and appropriate public education during the 2006-2007 and 2007-2008 school years.

35.   "It is the responsibility of the student's teachers, therapists and administrators - and of the multi-disciplinary team that annually evaluates the student's progress - to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly. The student's right to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith." *David G. v. Council Rock Sch. Dist.*, 2009 U.S. Dist. Lexis 96338, at *15-*16 (E.D. Pa. 2009) (quoting *M.C. v Central Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir.), *cert. denied*, 519 U.S. (1996).

36. Compensatory education is an in-kind remedy intended to provide educational services to a child to remedy a school district's failure to provide FAPE.

37. Compensatory education should be computed from the time a school district knows, or should know, of inappropriate programming.  Elizabeth's failure to make

progress in reading, as well as in social, emotional, and behavioral areas, impacted her education throughout the day.  Thus, Elizabeth is entitled to full days of compensatory education from March 2, 2007 through August, 2009 (including compensatory education for ESY services).

## COUNT II
## COMPENSATORY DAMAGES AND EXPERT FEES
## SECTION 504 AND THE ADA

38. Plaintiffs incorporate ¶¶ 1 through 37 as if set forth fully herein.

39. Section 504 incorporates the remedies available under the Civil Rights Act of 1964, which specifically provides for the taxation of expert fees. See 29 U.S.C. § 794a(2) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."); 42 U.S.C. §2000e-5(k) ("[T]he court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs.").

40. Compensatory damages are available for violations of Section 504 and the ADA. *W.B. v. Matula*, 67 F.3d 484, 494 (3d Cir. 1995); *D.E. v. Central Dauphin Sch. Dist.*, 2009 U.S. Dist. LEXIS 27477, at *23-*24 (M.D. Pa. Mar. 31, 2009).

## COUNT III
## INTERFERENCE AND RETALIATION
## SECTION 504 AND THE ADA

41. Plaintiffs incorporate ¶¶ 1 through 40 as if set forth fully herein.

42. The regulations implementing Section 504 provide:  "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by . . . this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part."  34 CFR § 100.7(e) (Title VI regulations applicable to Section 504 claims by virtue of 34 CFR § 104.61).

43. Pursuant to the Americans with Disabilities Act, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under this Act.  42 U.S.C. § 12203(a).

44. Pursuant to the Americans with Disabilities act, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act."  42 U.S.C. § 12203(b).

45. The District has adopted a policy that explicitly denies access to Parents' experts _because_ Parents plan to use the evidence resulting from such access in the due process hearing convened to remedy an alleged deprivation of FAPE.  This policy violates the anti-retaliation provisions of Section 504 and the ADA.

46. Further, in violation of Section 504 and the ADA, the District policy unlawfully interferes with Parents' ability to invoke their procedural protections.  Parents are unfairly "left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition."  *Schaffer*, 546 U.S. at 60-61.

**WHEREFORE**, Plaintiffs respectfully request that this Court

1.      Assume jurisdiction over this action;

2.      Consider the administrative record below, and hear additional evidence as necessary to make an accurate, independent decision on the merits;

3.      Reverse the decision of the Pennsylvania Special Education Hearing Officer;

4.      Declare that the Defendants' actions and omissions violate IDEA, Section 504, the ADA, and Pennsylvania law;

5.      Order full days of appropriate compensatory education relief for Elizabeth from March 2, 2007 through August, 2009 (including days of ESY programming);

6.      Order appropriate monetary relief for Defendant's violations of Section 504 and the ADA;

7.      Order payment of reasonable attorney's fees and costs (pursuant to IDEA, Section 504 and the ADA) and reimbursement of expert fees (pursuant to Section 504);

8.      Order such other relief as may be just and appropriate.

Respectfully submitted,

REISMAN CAROLLA LLP

Dated: October 20, 2009

Catherine Merino Reisman
19 Chestnut Street
Haddonfield NJ 08033-1810
t 856.354.0071
f 856.873.5640
creisman@reismancarolla.com

**Attorneys for Elizabeth, Tina and Carl D.**

Pennsylvania
# Special Education Hearing Officer

DECISION

Child's Name:  Elizabeth D

Date of Birth:

Dates of Hearing:  5/1/09, 6/3/09, 6/29/09,
6/30/09, 7/1/09, 7/13/09

CLOSED HEARING

ODR No.  9777/08-09 AS

<u>Parties to the Hearing</u>:

<u>Parents</u>
Mr. & Mrs. Carl D

<u>School District</u>
Colonial
230 Flourtown Road
Plymouth Meeting, PA 19462-1252

<u>Representative</u>:

<u>Parent Attorney</u>:
Catherine Reisman, Esq.
Reisman Carolla LLP
19 Chestnut Street
Haddonfield NJ 08033-1810

<u>School District Attorney</u>
Sarah Davis, Esq.
Sweet, Stevens, Katz & Williams
331 Butler Avenue, P.O. Box 5069
New Britain, PA 18901 -0934

Date Record Closed:                 August 14, 2009

Date of Decision:                    August 29, 2009

Hearing Officer:                     Anne L. Carroll, Esq.

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)**
**Exhibit 1 to Complaint**

## INTRODUCTION AND PROCEDURAL HISTORY

Elizabeth D⬛⬛⬛ enrolled in the Colonial School District as a kindergarten student in the 2006/2007 school year.  At the request of her teacher, the District's Student Support Team began discussing Elizabeth's immaturity and slow progress in November 2007.  When concerns about her academic progress were not resolved through that process, Elizabeth was evaluated for a speech/language impairment in January 2007 and found to be IDEA eligible.  Soon after Elizabeth's initial IEP was implemented, the SST team recommended a comprehensive psycho-educational evaluation, resulting in a first grade IEP that provided for additional special education services, including part-time learning support and social skills training.   Elizabeth was reevaluated by the District during the summer of 2008, and her Parents also obtained two independent psycho-educational evaluations in that period, resulting in recommendations for additional goals and services in second grade.

When the parties were unable to reach an agreement on an IEP for the 2008/2009 school year by mid-August 2008, Elizabeth's Parents withdrew her from the District and enrolled her in a private school.  In March 2009, Parents filed a due process complaint to seek tuition reimbursement, compensatory education for the 2006/2007 and 2007/2008 school years and for the District's alleged failure to provide appropriate ESY services to Elizabeth in 2008.

The due process hearing was held over six sessions between May 1 and July 13, 2009. For the reasons explained below, Parents' claims for tuition reimbursement and compensatory education are denied.

## ISSUES

1.  Did the Colonial School District violate its child find obligations by failing to
    evaluate Elizabeth D⬛⬛⬛ prior to January 2007 to determine that she is IDEA
    eligible and provide special education services to her prior to March 2007 and/or by
    concluding that she does not have a specific learning disability?

2.  Is Elizabeth D████ entitled to an award of compensatory education for Colonial School District's failure to provide her with FAPE at any time during the 2006/2007 and/or 2007/2008 school years, and/or the summer of 2008, and if so, for what period(s), in what amount and in what form?

3.  Are Elizabeth D████'s Parents entitled to reimbursement for the private school tuition they paid for the 2008/2009 school year?

## FINDINGS OF FACT

### A. Background/Evaluations/Eligibility

1.  Elizabeth D████ is an ██ year old child, born ████████ . She is a resident of the Colonial School District and is eligible for special education services. (Stipulation, N.T. p. 17)

2.  Elizabeth has a current diagnosis of speech/language impairment in accordance with Federal and State Standards. 34 C.F.R. §300.8(a)(1), (c)(11); 22 Pa. Code §14.102 (2)(ii); (Stipulation, N.T. p.18)

3.  Elizabeth's kindergarten teacher expressed concerns about her academic skills early in her kindergarten year, as did her Parents. In November, 2006, the teacher discussed her concerns with the school's Student Support Team (SST), resulting in suggestions for interventions. (N.T. pp. 401, 404, 405, 408, 421, 620, 621; S-15)

4.  In January 2007, the District sought and was granted permission to conduct a speech/language evaluation, which resulted in the conclusion that Elizabeth is IDEA eligible due to a speech/language impairment affecting both receptive and expressive language and placing her significantly below her same-age peers in language skills. (N.T. pp. 408, 410, 1437—1440; S-2, S-3)

5.  By March 2007, because the SST team was concerned that Elizabeth's language impairment continued to interfere with Elizabeth's academic, social and behavior progress despite speech/language therapy and the supports and services provided the regular education kindergarten classroom, the District sought and received Parents' permission to conduct a comprehensive psycho-educational evaluation. The school psychologist completed the evaluation during the remainder of the 06/07 school year and produced a report dated August 7, 2007. (N.T. pp. 408, 411, 413, 476, 477, 506; S-4)

6.  The District's school psychologist administered a number of standardized assessments designed to estimate Elizabeth's overall cognitive ability, measure her processing abilities related to reading and her academic achievement, specifically, the WIPPSI-III (Wechsler Preschool and Primary Scale of Intelligence-Third Edition), CTOPP (Comprehensive Test of Phonological Processing), WIAT-II (Wechsler Individual Achievement Test-Second Edition) and WJ-III (Woodcock-Johnson Tests of Achievement-Third Edition). (S-4)

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)**
**Exhibit 1 to Complaint**

7.      The test results placed Elizabeth's cognitive functioning overall in the low to below average range, with low average verbal skills and below average to borderline/moderately below average nonverbal performance skills.  Elizabeth's scores on the standardized achievement measures ranged from average to moderately below average, with several scores in the low average range.  The CTOPP placed her phonological processing skills in the poor range.  (N.T. pp. 482—484, 489, 507, 517, 518; S-4)

8.      The evaluator noted that although the validity of the test results was not affected, Elizabeth's distractibility and attention difficulties during testing may have resulted in slightly underestimating her cognitive abilities.  (N.T. pp. 479, 480, 483—487, 491, 507; S-4, S-5)

9.      The District psychologist also assessed Elizabeth's behavior and social functioning using the BASC-II  (Behavior Assessment System for Children-Second Edition) and Connors Rating Scale for ADHD (attention deficit/hyperactivity disorder).  Although she found no significant school behavior concerns, Parents' and teachers' ratings were significantly elevated in the areas of inattention, learning problems and hyperactivity.  (N.T. pp. 521—524; S-4, S-5)

10.     Based upon the evaluation results, the psychologist identified significant academic needs, as well as needs in the areas of attention, focus and independence, recommending that specially designed instruction be provided in those areas.  Elizabeth's IEP team concluded that she should receive part-time learning support in 1st grade for instruction in reading, math, writing; that her IEP should address her attention/behavior needs, as well as continue to include language goals along with speech/language therapy.  (N.T. pp. 527, 528; S-4, S-5)

11.     In May 2008 and April 2009, Elizabeth's Parents obtained an independent educational evaluation which confirmed the results of the District's evaluations in both results and observations of Elizabeth's distractibility and attention issues during testing. (N.T. pp. 152—155, 173—175, 554, 555; P-5)

12.     In August 2008 Parents also obtained an evaluation from a play therapist to address their concerns about Elizabeth's social immaturity.  The evaluator noted Elizabeth's difficulties with sustaining attention to play themes, engaging in reciprocal conversation and transitioning from one activity to another.  She also noted an issue with body-space awareness that might indicate sensory needs.  (N.T. pp. 43--49; P-7)

13.     During the summer of 2008, the District conducted a reevaluation of Elizabeth including a WISC-IV (Wechsler Intelligence Scale for Children-Fourth Edition) and standardized achievement tests.  At that evaluation session, the District's school psychologist noted some improvement in Elizabeth's ability to remain seated, attend and focus on the tasks, although she was again distractible.  As with the previous testing, the attention factor may have resulted in underestimating Elizabeth's cognitive abilities.   (N.T. pp. 509—512, 537; S-9)

14.     The FSIQ (Full Scale IQ) yielded by the WISC-IV was consistent with the results of the WPPSI-III, placing Elizabeth's functioning overall upper end of the borderline range.  There was, however, more scatter in the subtest scores.  Elizabeth's score on the Verbal Comprehension Index was in the average range, while Perceptual Reasoning was in the

4

borderline range.  Working Memory and Processing Speed results were in low average range. (N.T. p. 510; S-9, p. 15)

15.     In June 2008, Elizabeth was also reevaluated by a school psychologist employed by a Pennsylvania Intermediate Unit, but who was serving as a private, independent evaluator for that purpose.  He administered the RIAS (Reynolds Intellectual Abilities Scale), an assessment of cognitive potential that minimizes language, processing speed and working memory demands. Testing yielded a Composite IQ of 97, a Verbal Index score of 105 and a Nonverbal Index score of 89. Based upon his clinical judgment, his own research into test correlations and his belief that the difference between the Verbal and Nonverbal Index scores is so statistically significant that the composite IQ score is meaningless, the psychologist opined that the Verbal Index Score is most representative of Elizabeth's overall potential in school. (N.T. pp. 1178, 1181, 1182, 1230—1236, 1239, 1240; S-11)

16.     The psychologist also administered several other tests that measured aspects of intellectual and social/behavioral functioning, all of which yielded below average scores.  He determined that Elizabeth has language-based specific learning disabilities based upon the discrepancy between her Verbal Index score and those test results (N.T. pp. 1190—1196, 1238, 1241, 1249, 1250, 1296; S-11)

17.     The independent evaluator also concluded that Elizabeth's language impairments interfere with her acquisition of academic skills and social development.  (N.T. pp. 1199, 1200, 1277; S-11)

18.     At Parents' request, the District provided an independent OT evaluation consisting of the SIPT (Sensory Integration and Praxis Test), which was completed in August 2008. The test results indicated that Elizabeth's greatest problems were in areas with higher visual components such as spatial visualization, design copying, manual form perception and figure-ground discrimination School-related recommendations based upon the SIPT results included preferential seating, decreasing distractions, repetition of directions, heightened sensory feedback, swivel chair, sensory processing activities, large movement sensory breaks.  (N.T. pp. 274, 1572, 1574, 1594; S-12)

B.  Interventions/Services/ Progress During the 2006/2007 School Year

19.     The SST screens children in the early elementary years (K-3) who are struggling with school-related skills and develops strategies to support the classroom teacher in addressing the identified needs within the classroom.  (N.T. pp. 446, 447, 449, 450, 732, 790, 791, 1429)

20.     On November 9, 2006, the SST team met to discuss Elizabeth's progress and the areas of concern that her teacher identified, including immature language and social skills, difficulties with math, fine motor skills and inattention/staying on task. At the time of the SST referral On October 20, 2006, Elizabeth could not draw a recognizable picture or write her name, although she could produce some letters.  (N.T. pp. 404, 407, 622, 643, 1434, 1435; S-15)

**Elizabeth D. v. Colonial Area S.D.  (E.D. Pa.)
Exhibit 1 to Complaint**

21.     Interventions already in place for Elizabeth included working in a small group with a reading specialist, 1:1 instruction, additional time on task, parent conferences, extra handwriting practice.  (N.T. pp. 405, 406, 623, 625; S-15)

22.     The SST recommended focusing on "Kid Writing" to address Elizabeth's oral and written expression, with significant 1:1 support to encourage her to draw a picture while dictating a sentence about it. Kid Writing is a research-based program that focuses on phonemic awareness, initial sounds and letter writing.  Elizabeth was also referred for speech and OT screenings. (N.T. pp. 408, 411, 412, 1435, 1436; S-15)

23.     The initial speech/language support IEP developed for Elizabeth in early March 2007 included goals designed to increase her ability to follow directions, relate her own experiences, retell stories and correctly use graphical morphemes (plurals, past tense).  Those skill areas affect development of early academic skills in reading, math and written expression.  (N.T. pp. 1443, 1444, 1450; S-2)

24.     Special education services provided to Elizabeth in the initial IEP included six 30 minute sessions of speech/language therapy/month and modifications implemented in her regular kindergarten class, including small group instruction, use of graphic organizers to provide visual cues to support story telling, repetition, reinforcement of correct grammar by verbal praise and breaking directions into smaller steps.  Elizabeth made documented progress on her speech/language IEP goals during the rest of the kindergarten year.  (N.T. pp. 1445—1450 ; S-2, S-24, p. 19)

25.     The Parental input form for the second evaluation, submitted in April 2009, noted Elizabeth's progress in the 7 months since she began kindergarten, including her ability to write her name and read some sight words.  (S-4)

26.     With her IEP modifications in place, Elizabeth's kindergarten report card reflected progress, as indicated by a Proficient  (PR) or Partially Proficient (PP) in many language-based skill areas.  Story retelling, name writing and recognizing high frequency sight words were especially notable areas of progress.  Progress in writing was also noted, but Elizabeth still struggled with most math skills.  (N.T. pp. 649—651, 658—663, 675; S-14, S-26, S-27, p. 11)

27.     By the end of kindergarten, Elizabeth was able to meet some of the District's kindergarten curriculum standards for math, reading and writing.  Her inability to meet all such standards was the reason her first grade IEP (2007/2008 school year) provided for a learning support class rather than a regular education setting for those areas.  (N.T. pp. 665—672; S-38, S-39)

28.     Elizabeth also received predominantly Satisfactory (S) designations in the component skills under social skills and work habits.  (N.T. pp. 190—192; S-14)

6

C. Interventions/Services/Progress During the 2007/2008 School Year, Summer 2008

29.    The IEP provided for Elizabeth's 1st grade year included goals for reading, math, written expression, attention/ behavior and speech/language.  (N.T. pp. 457, 1452, S-5)

30.    Elizabeth's academic needs in reading, math and written expression were addressed through speech/language therapy as well as direct instruction in a learning support class, often on a 1:1 basis. (N.T. pp. 884—905, 914—919, 926—930, 934, 935, 1456—1458; S-27)

31.    Elizabeth's learning support teacher provided numerous creative instructional strategies to address Elizabeth's academic needs, engage her in the learning process and reduce the effects of her attention difficulties.  (N.T. pp. 886—905, 918, 996, 997; S-27, pp. 26—30)

32.    When Elizabeth's behaviors began interfering with instruction, the learning support teacher developed and successfully implemented behavior interventions to address those issues to the extent possible.  Neurologically-based behaviors, such as hyperactivity and impulsiveness, which Elizabeth exhibited, cannot be entirely eliminated by classroom behavior interventions. The behavior strategies were directed toward classroom behaviors, such as work refusal, that could be changed with good management.  (N.T. pp. 806—809, 909—911, 914, 986—990; S-17)

33.    The learning support program Elizabeth received during the 2007/2008 school year provided specially designed instruction in areas recommended in the August 2008 report from Parents' independent evaluator. (N.T. pp. 1303, 1304, 1306, 1308, 1310; S-5, S-8, S-11)

34.    Although no specific social skills needs were identified for Elizabeth in the August 2007 evaluation report, there were ongoing concerns about Elizabeth's immaturity.  Social skills needs were addressed through guidance lessons provided in the regular education classroom and participation in a lunch group.  Elizabeth's social skills increased, but she remained immature in comparison to her 1st grade classmates, prompting consideration of whether her 2nd grade regular education inclusion should be with 1st or 2nd grade during the 2008/2009 school year.  (N.T. pp. 419, 420, 768—771, 813, 863, 1011, 1012; S-4, S-5)

35.    An occupational therapist under contract with the District visited Elizabeth's 1st grade learning support class weekly for consultation on sensory integration and handwriting strategies. Although the OT was there to assist all students in the class, Elizabeth's teacher frequently requested strategies specifically for her.  (N.T. pp. 809, 991—994, 1556, 1560—1562, 1575)

36.    Elizabeth's 1st grade program incorporated sensory strategies that were later recommended in the SIPT evaluation.  (N.T. pp. 1576—1578, 1596, 1604, 1607, 1608; S-5, S-12)

37.    The learning support teacher kept extensive notes and progress monitoring data documenting her strategies and Elizabeth's progress during her 1st grade year.  Elizabeth's progress accelerated toward the end of the school year, in April and May 2008.  (N.T. pp. 737,

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)**
**Exhibit 1 to Complaint**

738, 810—812, 814—818, 894, 905, 930—941, 943, 945—982, 998; P-1, p. 13S-16, S-17, S-18, S-25, S-26, S-27)

38.     Elizabeth continued to receive speech/language therapy during 1st grade.  Her speech/language therapist maintained progress monitoring data throughout the 2007/2008 school year, which demonstrated progress.  Elizabeth's progress toward the speech/language goals in the kindergarten IEP was reported in the 1st grade IEP.  (N.T. pp.1450—1454; S-2, S-5, pp. 16, 17, S-24)

39.     The District initially considered Elizabeth ineligible for ESY services during the summer of 2008, but reconsidered its decision at Parents' request.  Although a final decision concerning ESY eligibility was never formally reached, the District subsequently offered a NOREP in reading during the summer of 2008.  The District provided for Elizabeth's participation in one of its regular summer programs for reading instruction, but Elizabeth was accompanied by a certified teacher to provide 1:1 support, since her reading levels were lower than usually required for that program.  During the summer program, Elizabeth worked on both reading and writing skills and made progress on both the skills taught and in working independently.  (N.T. pp. 236, 237, 240, 241, 252, 253, 259, 756, 757, 760—762, 771—773, 848, 850, 851, 854—856, 944, P-41, S-6, S-8, p. 26, S-19)

D.   IEP Offered for the 2008/2009 School Year

40.     The final IEP offered by the District for the 2008/2009 school year was sent to Parents on August 21, 2008 before school opened.  It included revisions of the IEP draft discussed at an August 11, 2008 IEP meeting with final revisions incorporating new information and the concerns Parents expressed in an August 14, 2008 letter.  (N.T. pp. 1058—1074, 1144, 1148—1153, 1469; P-29, S-31)

41.     Goals and specially designed instruction included in an earlier draft of the District's proposed IEP for the 2008/2009 school year encompassed all of the recommendations included in the August 2008 report from Parents' independent evaluator.  (N.T. pp. 1303, 1304, 1306, 1308, 1310; S-8, S-11)

42.     The final 2008/2009 IEP offer by the District included 27 separate goals encompassing the areas of language, reading, written expression, math, social skills, behavior, fine motor skills and sensory needs, accompanied by an extensive list of specially designed instruction and modifications.  (N.T. pp. 1070—1074, 1469; S-31)

43.     The proposed IEP continued the same level of speech/language therapy provided since Elizabeth's first IEP.  (S-31)

44.     The District's final 2008/2009 IEP proposal incorporated OT goals and specially designed instruction to address sensory issues in the learning support classroom, including recommendations from the SIPT evaluation.  The proposed IEP also included 60 minutes/month of OT as a related service, including direct or consultative services  (N.T. pp. 1575, 1577, 1579—1581, 1589, 1590, 1597, 1598; S-31)

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)
Exhibit 1 to Complaint**

# DISCUSSION AND CONCLUSIONS OF LAW

A. Compensatory Education Issues

    1. FAPE Legal Standards

Under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1400, *et seq.*, and in accordance with 22 Pa. Code §14 and 34 C.F.R. §300.300, a child with a disability is entitled to receive a free appropriate public education (FAPE) from the responsible local educational agency (LEA) in accordance with an appropriate IEP, *i.e.*, one that is "reasonably calculated to yield meaningful educational or early intervention benefit and student or child progress." *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034 (1982); *Daniel S. v. Council Rock School District*, 2007 WL 3120014 (E.D.Pa. 2007). "Meaningful benefit" means that an eligible child's program affords him or her the opportunity for "significant learning." *Ridgewood Board of Education v. N.E.*, 172 F.3d 238 (3RD Cir. 1999). Consequently, in order to properly provide FAPE, the child's IEP must specify educational instruction designed to meet his/her unique needs and must be accompanied by such services as are necessary to permit the child to benefit from the instruction. *Rowley; Oberti v. Board of Education*, 995 F.2d 1204 (3rd Cir. 1993). An eligible student is denied FAPE if his program is not likely to produce progress, or if the program affords the child only a "trivial" or "*de minimis*" educational benefit. *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F. 2d 171 (3rd Cir. 1988).

Under the interpretation of the IDEA statute established by *Rowley* and other relevant cases, an LEA is not required to provide an eligible with services designed to provide the "absolute best" education or to maximize the child's potential. *Carlisle Area School District v. Scott P.*, 62 F.3d 520 (3rd Cir. 1995); *School Dist. of Philadelphia v. Deborah A.*, 2009 WL 778321 (E.D.Pa., 2009).

2.      Child Find

Both the federal IDEA and Pennsylvania special education regulations require school

districts to identify children who may be eligible for special education services and evaluate

them to determine eligibility.   34 C.F.R. §300.111; *Lauren W. v. DeFlaminis*, 480 F.3d 259 (3rd

Cir. 2007*); Annika T. v. Unionville Chadds-Ford School District,* 2009 WL 778350 (E.D.Pa.

2009);  *A.P. v. Woodstock Bd. of Education*, 572 F.Supp.2d 221 (D.Conn. 2008); *Charlotte-*

*Mecklenburg Bd. of Educ. v. B.H.*, 2008 WL 4394191 (W.D.N.C. 2008); 22 Pa. Code §§14.121,

122.

In accordance with §14.122 of the Pennsylvania special education regulations, a school

district must screen all students in certain areas as the first step in identifying children potentially

eligible for special education services, and may try early classroom interventions to determine

whether concerns can be resolved before proposing an IDEA evaluation to explore suspected

areas of need in detail.

The version of §14.122 in effect at the time the claims in this case arose provided as

follows with respect to the initial identification of potentially eligible students:

 Screening.

  (a)  Each school district shall establish a system of screening to accomplish the
       following:

   (1)  Identify and provide initial screening for students prior to referral for a special
education evaluation.

   (2)  Provide peer support for teachers and other staff members to assist them in working
effectively with students in the general education curriculum.

   (3)  Conduct hearing and vision screening in accordance with section 1402 of the
Public School Code of 1949 (24 P. S. § 14-1402) for the purpose of identifying students
with hearing or vision difficulty so that they can be referred for assistance or
recommended for evaluation for special education.

10

(4)  Identify students who may need special education services and programs.

(b)  Each school district shall implement a comprehensive screening process. School districts may implement instructional support according to Department guidelines or an alternative screening process. School districts which elect not to use instructional support for screening shall develop and implement a comprehensive screening process that meets the requirements specified in subsections (a) and (c).

(c)  The screening process shall include:

(1)  For students with academic concerns, an assessment of the student's functioning in the curriculum including curriculum-based or performance-based assessment.

(2)  For students with behavioral concerns, a systematic observation of the student's behavior in the classroom or area in which the student is displaying difficulty.

(3)  An intervention based on the results of the assessments under paragraph (1) or (2).

(4)  An assessment of the student's response to the intervention.

(5)  A determination as to whether the student's assessed difficulties are due to a lack of instruction or limited English proficiency.

(6)  A determination as to whether the student's needs exceed the functional ability of the regular education program to maintain the student at an appropriate instructional level.

(7)  Activities designed to gain the participation of parents.

(d)  If screening activities have produced little or no improvement within 60 school days after initiation, the student shall be referred for evaluation under § 14.123 (relating to evaluation).

(e)  Screening activities do not serve as a bar to the right of a parent to request an evaluation, at any time, including prior to or during the conduct of screening activities.

3.      Screening/Evaluations/Identification

Parents suggested throughout the hearing in this case that the District acted improperly by first referring Elizabeth to the school's SST to address the concerns identified by both her teacher and her Mother early in her kindergarten year. They contend that the SST process was insufficient and improperly delayed an evaluation that would have identified Elizabeth's

11

speech/language impairment, thereby delaying special education services to address the needs arising from her disability.

Parents further argue that by limiting the initial evaluation to speech/language, the District deprived Elizabeth of additional services to address her academic difficulties and improve her immature social skills.  Finally, Parents contend that by not permitting them to participate in the SST process, or even notify them that it was occurring, the District deprived them of their rights under the IDEA.

The latter argument was asserted in support of Parents' contention that they should be permitted to seek compensatory education to the beginning of the 2006/2007 school year, rather than from March 2, 2007, two years before the complaint in this case was filed.[1]   Parents contend that the District's alleged procedural violations with respect to the screening process should be deemed to extend the limitation periods in this case.  It is, however, unnecessary to discuss in detail whether Parents' claims prior to March 2, 2007 are barred, or, indeed, whether procedural violations occurred.  A determination that FAPE was denied must be based on substantive grounds, 34 C.F.R. §300.513.  The evidence establishes that the District's procedures did not result in a deprivation of educational benefit to Elizabeth as Parents contend.

With respect to the pre-evaluation screening process, there is a sometimes delicate balance between allowing sufficient time for reasonable attempts to address concerns through teaching methods and other classroom strategies and an unwarranted delay in referring a child for an evaluation.  When interventions in the regular classroom do not lead to sufficient

---

[1]  When IDEA was re-authorized in 2004, it included amendments limiting the contents of due process complaints to "…a violation that occurred not more than two years before the date the parent or public agency knew or should have known of the alleged action which forms the basis of the complaint." 20 U.S.C. §1415(b)(6)(B); 34 C.F.R. §300.507(a)(2).  In addition, a request for a hearing must be made "within two years of the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint."  20 U.S.C. §1415(f)(3)(C); 34 C.F.R. §300.511(e).

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)**
**Exhibit 1 to Complaint**

improvement within a reasonable time, a district is required to seek parental permission to evaluate.  In the version of §14.122 that was in effect in 2006 and 2007, the appropriate time for assessing the effectiveness of  screening activities was set at 60 days.  Here, although Parents correctly noted that Elizabeth was not referred for a complete psycho-educational evaluation until March 2007, their argument that she was not timely evaluated ignores the speech/language evaluation in January 2007 which initially established her IDEA eligibility.  (F.F. 4)

Although Elizabeth's needs resulting from her receptive and expressive language impairment were ultimately determined to be significant, it must be noted that she entered kindergarten just three months after her 5th birthday, at the younger end of the age spectrum for beginning kindergarten.  In addition, as noted by her kindergarten teacher, developmental levels of students entering kindergarten students are quite variable.  (N.T. pp. 648, 652--654)   Just as the appropriateness of an IEP must be determined at the time it was offered, not in light of subsequent developments, the District's actions with respect to evaluating Elizabeth must be judged in terms of what its staff knew and observed during the 06/07 school year as it unfolded and their knowledge of Elizabeth grew, not based upon what they learned from later evaluations. *See, School District of Philadelphia v. Deborah A.*, 2009 WL 778321 at *7, *citing Fuhrman v. Hanover Board of Education*, 993 F.2d 1031, 1040 (3rd Cir. 1993).   Moreover, when interventions are put in place, it takes some time to determine their effectiveness, including whether small adjustments will result in improvements.

The record in this case establishes that the District did not ignore either Elizabeth's functioning in school or her Parents' concerns.  It screened, intervened, evaluated, added speech/language support and additional classroom supports, and evaluated again during the same school year as it became apparent that Elizabeth needed more services to make meaningful

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)
Exhibit 1 to Complaint**

progress.  (F.F. 3, 4, 5, 6, 10   Moreover, the elementary school counselor, who attended the first

parent-teacher conference in Elizabeth's kindergarten year, testified credibly and without

contradiction that Parents preferred to defer an IDEA evaluation until informal classroom

interventions were attempted.  (N.T. pp. 401, 402)  The counselor further testified that she

explained the option of referring Elizabeth to the Student Support Team to Parents at the time

and they approved it.  (N.T. p. 402)   Parents offered no testimony to the contrary.  S*ee*, N.T. pp.

1111—1166.

Parents' preference would not relieve the District of its child find obligations, but that

circumstance, along with the District's reasonable steps to address Elizabeth's early academic

problems followed by two formal evaluations lends additional support to the conclusion that the

District did not violate its child find obligations in the 2006/2007 school year.

Based upon the opinion of the second of the independent school psychologists who

evaluated Elizabeth, Parents argued that a second child find violation arose from the District's

failure to identify specific learning disabilities as her primary eligibility category.  The means by

which the psychologist reached his conclusion that Elizabeth's IDEA eligibility is actually due

specific learning disabilities was both highly unusual and thoroughly unpersuasive.  The most

important factor in rejecting Parents' contention that speech/language impairment is an

inaccurate eligibility category, however, was the psychologist's inability to identify any

substantive difference changing the category would have made with respect to either the program

and placement provided for Elizabeth during the 2007/2008 school year or the District's

proposals for the 2008/2009 school year.   The independent evaluator agreed that Elizabeth's

language impairment was the most significant factor in limiting her academic achievement, and

14

admitted that the specially designed instruction provided in both the past and proposed District IEPs were completely in accord with his recommendations.  (F.F. 33, 41)

    4.  Services/Progress During the 2006/2007 School Year

Although Elizabeth was not at the levels expected of a typical student at the end of kindergarten in terms of standardized assessments of achievement, she is not a typical student. Despite the severity of her language disability and the significant needs resulting from it, which did not become apparent until she was faced with the demands of academic tasks, Elizabeth made significant progress as reflected in both her kindergarten report card and her Mother's assessment that she had "come a long way" since the beginning of the school year.  S-4, p. 2; S-14)

    5.  Services/Progress During the 2007/2008 School Year/ESY

Elizabeth received special education services during her 1st grade year that effectively addressed her language, academic, behavior and sensory needs. (F.F. 29, 30)  Elizabeth's learning support classroom and speech/language therapy provided small group and 1:1 instruction and a supportive learning environment.  (F.F. 31, 34, 35)  Although Elizabeth's speech/language impairment, attention difficulties and sensory needs interfered with academic learning, she made slow but steady progress that increased toward the end of the 2007/2008 school year.  (F.F. 37) There is extensive evidence that Elizabeth's 1st grade IEP was reasonably calculated to assure progress commensurate with her ability and her needs, and that she was able to derive meaningful benefit from her education.  It is unrealistic to expect that Elizabeth would finish the 2007/2008 school year at grade level in light of her significant needs and does not negate the conclusion that the District provided an appropriate program for her.

15

Although the District could have planned earlier for ESY services for the summer of 2008, Elizabeth did receive appropriate services in reading and was able to consolidate and even increase her skills through the summer reading program.

The record in this case provides no basis for an award of compensatory education for any portion of the 2006/2007 school year, for the 2007/2008 school year of for the summer of 2008.

<u>B.  Tuition Reimbursement</u>

1.    Legal Standards

In *Burlington School Committee v. Department of Education of Massachusetts*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the United States Supreme Court established the principle that parents do not forfeit an eligible child's right FAPE, to due process protections, or to any other remedies provided by the IDEA statute and regulations, by unilaterally selecting a placement other than that offered by the District.  Parents do, however, place themselves at financial risk.   Although parents are always perfectly free to decide upon the program/placement they believe will best meet their child's needs, to obtain public funding for that choice, they must meet well-established legal requirements

To determine whether parents are entitled to reimbursement from their school district for special education services provided to an eligible child at their own expense, a three part test is applied based upon the *Burlington School Committee* case.   The first step is to determine whether the program and placement offered by the district is appropriate for the child.  Only if that issue is resolved against the district are the second and third steps considered, *i.e.*, is the program proposed by the parents appropriate for the child and, if so, whether there are equitable considerations that counsel against reimbursement or affect the amount thereof.  *See also,*

16

*Florence County School District v. Carter*, 510 U.S. 7, 15, 114 S. Ct. 361, 366, 126 L. Ed. 2d 284 (1993); *Lauren W. v. DeFlaminis*, 480 F.3d 259 (3rd Cir. 2007).

    2.   Appropriateness of the IEP offered for the 2008/2009 School Year

There was considerable testimony at the hearing concerning IEP meetings during the spring and summer of 2008 leading to the District's final IEP offer for the 2008/2009 school year, transmitted via letter dated August 21, 2008.  (F.F. 40; S-31)  Parent candidly testified that she could find no deficiency in the IEP proposed by the District on August 21, 2008, and that an earlier rejected draft also included goals and specially designed instruction directed toward addressing Parents' concerns and meeting Elizabeth's needs in the areas of attention and social skills.  (N.T. pp. 1144, 1150, 1153)  Parent noted, however, that it came late in the process, after Parents had already decided on the unilateral private placement.  (N.T. p. 1152)

The IDEA statute and regulations provide that school districts must have an IEP in effect for each eligible child at the beginning of each school year.  34 C.F.R. §300.323(a).  There is no evidence that the District would not have met that standard if Parents had accepted the admittedly appropriate IEP offered on August 21, 2008.  Indeed, Parent testified that the final IEP offer was received before the school year began.  (N.T. p. 1152)   Although Parents may have considered the District's final offer too late in terms of changing their plans for enrolling Elizabeth in private school, it complied with IDEA legal requirements in all respects.  Moreover, the evidence established that the earlier draft of the proposed IEP also included goals that were reasonably calculated to meet Elizabeth's needs, and had already addressed Parents' concerns in many respects.   (N.T. pp. 1135—1141, 1143, 1144 ; P-29, S-13, S-31)   The final IEP offer explicitly incorporated the remaining concerns raised in Parents' August 13 letter.  (N.T. pp. 1148--1151; P-29, S-31)

**Elizabeth D. v. Colonial Area S.D.  (E.D. Pa.)**
**Exhibit 1 to Complaint**

In light of the overwhelming evidence that the District offered an appropriate program and placement for Elizabeth for the 2008/2009 school year, Parents' claim for tuition reimbursement must be denied.  There is no need, therefore, to consider the appropriateness of Stratford Friends, the private school selected by Parents, or any equitable considerations that would preclude or reduce an award of tuition reimbursement.  It is also unnecessary to rule on Parents' motion to shift the burden of proof on the issue of the appropriateness of the private placement based upon the District's refusal to permit an observation of the learning support classroom to which Elizabeth would have been assigned had she remained enrolled in the District for the 2008/2009 school year.

## CONCLUSION

For the reasons explained above, Parents' claims will be denied in their entirety.

## ORDER

In accordance with the foregoing findings of fact and conclusions of law, it is hereby **ORDERED** that Parents' claims for compensatory education and tuition reimbursement are **DENIED.**

Anne L. Carroll

_____
Anne L. Carroll, Esq.
HEARING OFFICER

August 29, 2009

**Elizabeth D. v. Colonial Area S.D. ( E.D. Pa.)**
**Exhibit 1 to Complaint**

# RULES AND REGULATIONS

## Title 22—EDUCATION

### STATE BOARD OF EDUCATION
### [22 PA. CODE CHS. 14 AND 342]

### Special Education Services and Programs

The State Board of Education (Board) amends Chapter 14 (relating to special education services and programs) and deletes Chapter 342 (relating to standards relating to special education services and programs) to read as set forth in Annex A, under the authority of the Public School Code of 1949 (24 P. S. 1-101—26-2606-B) (act).

Notice of proposed rulemaking was published at 30 Pa.B. 4628 (September 2, 2000) with an invitation to submit written comments within 30 days. In addition, the Board held hearings on the proposed amendments on September 15, 21 and 25, 2000.

These final-form regulations establish procedures for the identification of students who are disabled and in need of special education services and programs and set forth requirements and procedures for the delivery of those services and programs.

*Response to Comments*

*Adoption by Reference*

Commentators and the House Education Committee recommended that the appropriate text of the Federal regulations from 34 CFR Part 300 (relating to assistance to states for the education of children with disabilities) be incorporated in the text of these final-form regulations. Other commentators supported the choice to adopt by reference. Early in its work, the Board's Standing Committee on Special Education studied and reviewed drafts of efforts to incorporate the Federal regulations in the text of Chapter 14 and determined that doing so would lead to unnecessarily lengthy regulations and lead to possible discrepancies between Federal intent and State intent. As a result, these final-form regulations have been drafted to incorporate Federal regulations by reference, adding in those areas where the Federal regulations require greater detail, when the Commonwealth's statutes or court decisions require specific language and when practices in this Commonwealth are different from those found in other jurisdictions. Federal regulations are adopted by reference in many regulations of this Commonwealth. The revised final-form regulations have added to all Federal regulation references in § 14.102 (relating to purposes) parenthetical descriptions of titles of those sections as provided in the Federal regulations to assist the reader. The Department of Education (Department) has and will continue to develop publications and other media to inform parents, teachers and administrators of their rights and responsibilities under both Federal and State statutes and regulations in regard to children with disabilities. Documents and websites which clearly link Federal and State regulations in a "side-by-side" format will be available upon final publication.

*Section 14.101 (relating to definitions)*

*Defining "student with a disability"*—The Independent Regulatory Review Commission (IRRC) recommended that a definition of "student with a disability" be added for clarification. A definition has been added in this final-form rulemaking. In addition, public commentators

and IRRC stated that the proposed rulemaking relying on the Federal definition is less specific than that currently found in Chapter 342 for students with mental retardation, which established an IQ of 80 or higher as a cutoff. By diminishing possible reliance on a single intelligence measure, multidisciplinary evaluation teams will be able to perform comprehensive evaluations, which may include IQ scores, to determine if a student has subaverage general intellectual functioning. Thus the Board elected to rely on the Federal definition.

*Definitions of "early intervention services" and "mutually agreed-upon written arrangements"*—IRRC recommended revising the definitions of "early intervention services" and "mutually agreed-upon written arrangements." The revised final-form rulemaking has deleted prior definitions and inserted references to the Early Intervention Services System Act (11 P. S. §§ 875-101—875-503) in defining these two terms.

*Definition of "parent"*—IRRC recommended clarifying the role of foster parents in obtaining special education or early intervention services. A definition of parent is added in the revised final-form rulemaking which includes foster parents so that foster parents in this Commonwealth will henceforward be able to act as parents.

*Section 14.122 (relating to screening)*

*Involvement of parents*—Commentators, the House Education Committee and IRRC asked that provisions be added to the screening process requirements that would involve parents in this process. Language has been added in § 14.122(c)(7) (relating to screening).

*Section 14.123 (relating to evaluation)*

*Group of qualified professionals*—IRRC commented that this provision is vague and should be clarified. The professionals involved in each evaluation must be determined on a case-by-case basis. Listing all professionals who might serve would be nearly impossible to identify for the wide range of disabilities, be overly prescriptive and result in unnecessarily large evaluation teams. Ongoing guidance from the Department will be provided to help parents, teachers and administrators understand the professionals needed to evaluate students for disabilities.

*School psychologists*—Commentators, the House Education Committee and IRRC asked the Board to restore the requirement for school psychologists to be members of every multidisciplinary evaluation team. Other commentators supported the proposed rulemaking so that school psychologists would not be required to participate in evaluations which might be purely physical in nature (such as, deafness and hard of hearing, speech pathology). The final-form rulemaking has been revised to list those areas where a school psychologist must be part of the evaluation team. Similar language has been added to § 14.124 (relating to reevaluation).

*Section 14.131 (relating to implementation of the IEP)*

*Implementation of the IEP within 10 days*—Commentators, the House Education Committee and IRRC recommended that current language requiring the IEP to be implemented within 10 days be restored. The final-form rulemaking has been changed to include that requirement.

*Sections 14.141 and 14.142 (relating to educational placement)*

A number of issues regarding educational placement were raised by commentators, the House Education Com-

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)**
**Exhibit 2 to Complaint**

mittee and IRRC. These included: (1) "recommended" caseloads; (2) caseload limitations to be followed in intermediate unit (IU)-operated or multidistrict classes; (3) class size limitations; (4) the involvement of parents or teachers in the adoption of district caseloads; (5) caseloads and class sizes for regular education classes in which students with disabilities receive programs and services; and (6) age range limitations for special education classes. Public comments were received that favored educational placement as described in the proposed rulemaking as well as in opposition to it.

As a result, this final-form rulemaking has been revised in a number of areas. Caseload limitations are now mandatory and a process is established where school districts may request a variance from the caseload limitations by application to the Secretary. As part of the application materials, the district must describe how parents, teachers and others were able to review and offer comments on the requested caseload variance. Language regarding caseload for classes attended by students from more than one district has been clarified to require the caseload of the district in which the class is operated to be applied. IU itinerant services provided to multiple districts must follow caseload limitations.

Public comments were received that supported the elimination of class size restrictions currently found in Chapter 342. These individuals and organizations supported the flexibility permitted districts to structure and staff the programs and services as required in student IEPs. Other public commentators and the House Education Committee asked the Board to restore class size restrictions to limit possibilities for overcrowding special education classes. The Board's goal in considering changes to the current chart was to strike a balance between students' rights for a free appropriate public education (FAPE) and flexibility in staffing and scheduling necessary to provide FAPE effectively and efficiently to all students requiring special education. In its consideration of a variety of options, the Board became convinced that the IEP—the document that identifies the specially-designed instruction necessary for a student to receive FAPE—is the controlling document from which school's schedule staff, programs and services. And with over 220,000 IEPs, many including a variety of instructional and related support requirements, flexibility is important to effectively and efficiently meet the requirements of those plans.

The original class size restrictions were developed in the 1970s when special education was designed to exclude rather than include children in the general curriculum and when fewer students were identified and served through special education. Since that time, the range and number of disabilities has grown as well as the range and number of educational and professional services that are necessary to address those disabilities. More importantly, the direction for the delivery of special education has changed from exclusion to inclusion.

The Board found that class size restrictions were incongruent with current practice in the delivery of special education, provided little flexibility for educational purposes, and focused compliance issues on staffing snapshots rather than on whether or not students were meeting the goals of their IEP. The Board believes that compliance should be driven by attention to the student's IEP and the effectiveness of programs designed to help the student achieve the student's goals as outlined in the IEP.

The Board maintains its choice to eliminate class size restrictions in the final-form regulation for four reasons: (1) there is no Federal requirement to establish class sizes; (2) staffing of classes for students with disabilities must be constructed by schools from the requirements established in student IEPs and cannot be determined effectively as a uniform Statewide standard; (3) caseloads provide general protections to prevent overcrowding; and (4) procedural safeguards ensure that class size cannot serve as an impediment to any student achieving the student's goals as established in the IEP.

No caseloads or class sizes are established in this final-form rulemaking for regular education classrooms in which students with disabilities are included for most or all of the school day. Doing so would result in class size restrictions for most classes in this Commonwealth, a decision which is currently within the purview of locally-elected school boards.

Language on age range restrictions in special education has been retained in this final-form rulemaking.

*Section 14.143 (relating to disciplinary exclusion)*

Proposed Chapter 14 contained a provision that a disciplinary exclusion of the student with a disability of 15 days or longer constituted a change in placement, triggering the convening of the IEP team. Public comments were received in support of the provision and in opposition. Those commentators requesting a change stated that the provision was in excess of the Federal requirement which stated that disciplinary exclusions which constituted a pattern would constitute a change in placement. The Board did not change the final-form rulemaking because the 15-day limitation creates a clear standard for all to follow.

*Section 14.152 (relating to child find, public awareness and screening)*

*Comparability of screening requirements*—Public commentators and IRRC pointed out that the public notice requirements seeking to identify children suspected of being disabled were less detailed for early intervention than they were for school age programs. Language has been modified in this final-form rulemaking to be comparable.

*Section 14.162 (relating to scope of appellate panel review)*

Language has been added to this section to clarify the scope of review by the panel of hearing officers to reflect Federal regulations.

*Representation in Due Process Hearings*

Commentators and the House Education Committee questioned the change directed by the Office of Attorney General regarding representation at due process hearings. Additional consultation affirms the position taken by the Office of Attorney General and described in the proposed rulemaking. As a result, no change is found in this final-form rulemaking. Some commentators stated that this provision would require parents to engage the services of attorneys to participate in due process hearings. Nothing in the final-form rulemaking limits parents' rights to represent themselves and the interests of their children in due process hearings.

*Further Response to Public Comment*

A document containing detailed response to comments not included here was mailed to all public commentators and provided to the Governor's Office, Standing Committees and IRRC. A copy is available from Peter H. Garland,

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)**
**Exhibit 2 to Complaint**

Executive Director, State Board of Education, 333 Market Street, Harrisburg, PA 17126-0333, (717) 787-3787 or TDD (717) 787-7367.

*Affected Parties*

Students who need or may need special education services and programs are affected by these final-form regulations. The final-form regulations also affect parents and guardians of those students by guaranteeing their participation in the process of determining services and programs that best meet the needs of their child. School districts and intermediate units are affected through compliance with the final-form regulations.

*Cost and Paperwork Estimates*

These regulations provide procedures for consistent implementation of existing Federal and Commonwealth law and regulation. Adopting these revisions to Chapter 14 may result in savings by changing the reevaluation requirement from every 2 years to every 3 years (except for students who are mentally-retarded). This change could result in an approximate annual Statewide savings of $4.75 million for school districts.

School districts will experience additional costs over time in complying with new Federal requirements (that is, the requirement that regular education teachers participate in IEP meetings) that might minimize the potential savings described in this Preamble. New Federal regulations have created additional paperwork requirements including regarding student goals and benchmarks in the IEP, and the more frequent issuance of procedural safeguards notices related to IEP team meetings, reevaluation, and in certain disciplinary situations.

*Effective Date*

These final-form regulations will become effective upon final publication in the *Pennsylvania Bulletin*.

*Sunset Date*

The effectiveness of Chapter 14 will be reviewed by the Board every 4 years, in accordance with the Board's policy and practice respecting all regulations promulgated by the Board. Thus, no sunset date is necessary.

*Regulatory Review*

Under section 5(a) of the Regulatory Review Act (71 P. S. § 745.5(a)), on August 23, 2000, the Board submitted a copy of the proposed rulemaking published at 30 Pa.B. 4628 (September 2, 2000) to IRRC and to the Chairpersons of the House and Senate Committees on Education for review and comment.

In compliance with section 5(c) of the Regulatory Review Act, the Board also provided IRRC and the Committees with copies of the comments received as well as other documentation. In preparing the final-form regulations, the Board considered the comments received from IRRC, the Committees and the public.

Under section 5.1(d) of the Regulatory Review Act (71 P. S. § 745.5a(d)), the final-form regulations were deemed approved by the Senate Education Committee on February 26, 2001, and deemed approved by the House Education Committee on February 14, 2001. IRRC met on March 8, 2001, and disapproved the final-form regulations in accordance with section 6(a) of the Regulatory Review Act (71 P. S. § 745.6(a)).

Under section 7(a) of the Regulatory Review Act (71 P. S. § 745.7(a)), the Board, on March 15, 2001, served notice that the final-form regulations would be revised and promulgated under section 7(c) of the Regulatory

Review Act. On March 20, 2001, the Board submitted the agency report and the revised final-form regulations under section 7(c) of the Regulatory Review Act to the Office of the Governor, Senate Education Committee, House Education Committee and IRRC.

Under section 7(c) of the Regulatory Review Act the revised final-form rulemaking was approved by the Senate Education Committee on March 21, 2001, and deemed approved by the House Education Committee. IRRC met on April 5, 2001, and approved the revised final-form regulations.

*Contact Person*

The official responsible for information on the promulgation of these revised final-form regulations is Peter H. Garland, Executive Director, State Board of Education, 333 Market Street, Harrisburg, PA 17126-0333, (717) 787-3787 or TDD (717) 787-7367. The contact person for the implementation of these revised final-form regulations is Frances Warkomski, Director, Bureau of Special Education, 333 Market Street, Harrisburg, PA 17126-0333, (717) 783-2311 or TDD (717) 787-7367.

The Federal regulations adopted by reference herein may be found at http://www.ideapractices.org/lawandregs.htm, http://www.cisc.k12.pa.us/federalregister/ or by requesting a copy from Dr. Warkomski.

Alternative formats of the regulations (such as, Braille, large print, cassette tape) can be made available to members of the public upon request to Dr. Warkomski at the telephone numbers and address previously listed.

*Findings*

The Board finds that:

(1) Public notice of the intention to adopt these regulations was given under sections 201 and 202 of the act of July 31, 1968 (P. L. 769, No. 240) (45 P. S. §§ 1201 and 1202) and the regulations promulgated thereunder in 1 Pa. Code §§ 7.1 and 7.2.

(2) A public comment period was provided as required by law and all comments were considered.

(3) The regulations are necessary and appropriate for the administration of the act.

*Order*

The Board, acting under the authorizing statute, orders that:

(a) The regulations of the Board, 22 Pa. Code Chapters 14 and 342, are amended by deleting §§ 14.1—14.8, 14.21—14.25, 14.31—14.39, 14.41—14.45, 14.51—14.56, 14.61—14.68, 14.71—14.74, 342.1—342.8, 342.21—342.25, 342.31—342.39, 342.41—342.46, 342.51—342.56, 342.61—342.68 and 342.71—342.74; and by adding §§ 14.101—14.104, 14.121—14.124, 14.131—14.133, 14.141—14.144, 14.151—14.158, 14.161—14.162 to read as set forth at Annex A.

(b) The Executive Director will submit this order and Annex A to the Office of General Counsel and the Office of Attorney General for review and approval as to legality and form as required by law.

(c) The Executive Director of the Board shall certify this order and Annex A and deposit them with the Legislative Reference Bureau as required by law.

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)**
**Exhibit 2 to Complaint**

3024                    RULES AND REGULATIONS

(d) This order is effective upon final publication in the *Pennsylvania Bulletin*.

PETER H. GARLAND,
*Executive Director*

(*Editor's Note*: For the text of the order of the Independent Regulatory Review Commision relating to this document, see 31 Pa.B. 2238 (April 21, 2001).)

**Fiscal Note**: Fiscal Note 6-270 remains valid for the final adoption of the subject regulations.

**Annex A**

**TITLE 22.  EDUCATION**

**PART I.  BOARD OF EDUCATION**

**CHAPTER 14.  SPECIAL EDUCATION SERVICES AND PROGRAMS**

Sec.
14.1—14.8.       (Reserved).
14.21—14.25.     (Reserved).
14.31—14.39.     (Reserved).
14.41—14.45.     (Reserved).
14.51—14.56.     (Reserved).
14.61—14.68.     (Reserved).
14.71—14.74.     (Reserved).

**GENERAL PROVISIONS**

14.101.    Definitions.
14.102.    Purposes.
14.103.    Terminology related to Federal regulations.
14.104.    Educational plans.

**CHILD FIND, SCREENING AND EVALUATION**

14.121.    Child find.
14.122.    Screening.
14.123.    Evaluation.
14.124.    Reevaluation.

**IEP**

14.131.    IEP.
14.132.    ESY.
14.133.    Behavior support.

**EDUCATIONAL PLACEMENT**

14.141.    Terminology related to educational placement.
14.142.    Caseload for special education.
14.143.    Disciplinary placements.
14.144.    Facilities.

**EARLY INTERVENTION**

14.151.    Purpose.
14.152.    Childfind, public awareness and screening.
14.153.    Evaluation.
14.154.    IEP.
14.155.    Range of services.
14.156.    System of quality assurance.
14.157.    Exit criteria.
14.158.    Data collection.

**PROCEDURAL SAFEGUARDS**

14.161.    Prehearing conferences.
14.162.    Impartial due process hearing and expedited due process hearing.

**GENERAL PROVISIONS**

**§§ 14.1—14.8.  (Reserved).**

**§§ 14.21—14.25.  (Reserved).**

**§§ 14.31—14.39.  (Reserved).**

**§§ 14.41—14.45.  (Reserved).**

**§§ 14.51—14.56.  (Reserved).**

**§§ 14.61—14.68.  (Reserved).**

**§§ 14.71—14.74.  (Reserved).**

**§ 14.101.  Definitions.**

In addition to the definitions in § 14.102 and 14.103 (relating to purposes; and terminology related to Federal regulations) the following words and terms, when used in this chapter, have the following meanings, unless the context clearly indicates otherwise:

*Act*—The Early Intervention Services System Act (11 P. S. §§ 875-101—875-503).

*Agency*—An intermediate unit, school district, approved private school, State-operated program or facility or other public (excluding charter schools under 24 P. S. §§ 17-1701-A—17-1732-A) or private organization providing educational services to children with disabilities or providing early intervention services.

*Age of beginners*—The minimum age established by the school district board of directors for admission to the district's first grade under § 11.15 (relating to admission of beginners).

*Department*—The Department of Education of the Commonwealth.

*Developmental areas*—Cognitive, communicative, physical, social/emotional and self-help.

*Developmental delay*—A child who is less than the age of beginners and at least 3 years of age is considered to have a developmental delay when one of the following exists:

(i) The child's score, on a developmental assessment device, on an assessment instrument which yields a score in months, indicates that the child is delayed by 25% of the child's chronological age in one or more developmental areas.

(ii) The child is delayed in one or more of the developmental areas, as documented by test performance of 1.5 standard deviations below the mean on standardized tests.

*ESY*—Extended school year.

*Early intervention agency*—An intermediate unit, school district or licensed provider which has entered into a mutually agreed upon written arrangement with the Department to provide early intervention services to eligible young children in accordance with the act.

*Early intervention services*—As defined in the act.

*Eligible young child*—A child who is less than the age of beginners and at least 3 years of age and who meets the criteria in 34 CFR 300.7 (relating to a child with a disability).

*IEP*—Individualized education program.

*IST*—Instructional support team.

*MDT*—Multidisciplinary team.

*Mutually agreed-upon written arrangement*—As defined in the act.

*Parent*—The term as defined in 34 CFR 300.20 (relating to parent) and also includes individuals appointed as foster parents under 42 Pa.C.S. §§ 6301—6311 (relating to the Juvenile Act).

*Secretary*—The Secretary of the Department.

*Student with a disability*—A child of school age who meets the criteria in 34 CFR 300.7 (relating to a child with a disability).

**§ 14.102.  Purposes.**

(a) It is the intent of the Board that children with disabilities be provided with quality special education services and programs. The purposes of this chapter are to serve the following:

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)**
**Exhibit 2 to Complaint**

(1) To adopt Federal regulations by incorporation by reference to satisfy the statutory requirements under the Individuals with Disabilities Education Act (20 U.S.C.A. §§ 1400—1419) and to ensure that:

(i) Children with disabilities have available to them a free appropriate public education which is designed to enable the student to participate fully and independently in the community, including preparation for employment or higher education.

(ii) The rights of children with disabilities and parents of these children are protected.

(2) To adopt, except as expressly otherwise provided in this chapter, the requirements of 34 CFR Part 300 (relating to assistance to states for the education of children with disabilities) as published at 64 FR 12418—12469 (March 12, 1999). The following sections are incorporated by reference.

(i) 34 CFR 300.4—300.6 (defining the terms "act"; "assistive technology device"; and "assistive technology service").

(ii) 34 CFR 330.7(a) and (c) (defining the term "child with a disability").

(iii) 34 CFR 300.8—300.24 (defining the terms "consent"; "day"; "business day"; "school day"; "educational service agency"; "equipment"; "evaluation"; "free appropriate public education"; "include"; "individualized education program"; "individualized education program team"; "individualized family service plan"; "local educational agency"; "native language"; "parent"; "personally identifiable"; "public agency"; "qualified personnel"; and "related services").

(iv) 34 CFR 300.26 (defining the term "special education").

(v) 34 CFR 300.28 and 300.29 (defining the terms "supplementary aids and services"; and "transition services").

(vi) 34 CFR 300.121—300.125 (relating to free appropriate public education (FAPE); exception to FAPE for certain ages; full educational opportunity goal (FEOG); FEOG—timetable; and child find).

(vii) 34 CFR 300.138 and 300.139 (relating to participation in assessments; and reports relating to assessments).

(viii) 34 CFR 300.300 (relating to provision of FAPE).

(ix) 34 CFR 300.302—300.309 (relating to residential placement; proper functioning of hearing aids; full educational opportunity goal; program options; nonacademic services; physical education; assistive technology; and extended school year services).

(x) 34 CFR 300.311(b) and (c) (relating to FAPE requirements for students with disabilities in adult prisons).

(xi) 34 CFR 300.313 (relating to children experiencing developmental delays).

(xii) 34 CFR 300.320 and 300.321 (relating to initial evaluations; and reevaluations).

(xiii) 34 CFR 300.340 (relating to definitions related to IEPs).

(xiv) 34 CFR 300.342—300.346 (relating to when IEPs must be in effect; IEP meetings; IEP team; parent participation; and development, review and revision of IEP).

(xv) 34 CFR 300.347 (a), (b) and (d) (relating to content of IEP).

(xvi) 34 CFR 300.348—300.350 (relating to agency responsibilities for transition services; private school placements by public agencies; and IEPs—accountability).

(xvii) 34 CFR 300.401 (regarding responsibility of state educational agency in connection with children with disabilities in private schools placed or referred by public agencies).

(xviii) 34 CFR 300.403 (relating to placement of children by parents if FAPE is at issue).

(xix) 34 CFR 300.450—300.462 (relating to children with disabilities enrolled by their parents in private schools).

(xx) 34 CFR 300.500—300.515 (regarding certain due process procedures for parents and their children).

(xxi) 34 CFR 300.519—300.529 (relating to discipline procedures).

(xxii) 34 CFR 300.531—300.536 (regarding certain procedures for evaluation and determination of eligibility).

(xxiii) 34 CFR 300.540—300.543 (relating to additional procedures for evaluating children with specific learning disabilities).

(xxiv) 34 CFR 300.550—300.553 (relating to least restrictive environment (LRE) including general LRE requirements; continuum of alternative placements; placements; and nonacademic settings).

(xxv) 34 CFR 300.560—300.574(a) and (b) (providing for confidentiality of information).

(xxvi) 34 CFR 300.576 (relating to disciplinary information).

(3) To specify how the Commonwealth will meet its obligations to suspected and identified children with disabilities who require special education and related services.

(4) To provide to the Commonwealth, through the Department, general supervision of services and programs provided under this chapter.

(b) To provide services and programs effectively, the Commonwealth will delegate operational responsibility for school aged students to its school districts to include the provision of child find duties prescribed by 34 CFR 300.125(a) (relating to child find).

**§ 14.103. Terminology related to Federal regulations.**

For purposes of interfacing with 34 CFR Part 300 (relating to assistance to states for the education of children with disabilities), the following term applies, unless the context clearly indicates otherwise:

*Local educational agency*—Where the Federal provision uses the term "local educational agency," for purposes of this chapter, the term means an intermediate unit, school district, State operated program or facility or other public organization providing educational services to children with disabilities or providing early intervention services. Applicability of this term to public charter schools is found in Chapter 711 (relating to charter school services and programs for children with disabilities).

**§ 14.104. Educational plans.**

(a) Each school district shall develop a special education plan aligned with the strategic plan of the school district under § 4.13 (relating to strategic plans). The special education plan shall be developed every 3 years consistent with the 3-year review cycle of the strategic

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)**
**Exhibit 2 to Complaint**

plan of the school district. The Secretary will prescribe the format, content and time for submission of the special education plan.

(b) Each school district's special education plan shall specify special education programs that operate in the district and those that are operated in the district by the intermediate units, area vocational technical schools and other agencies.

(c) Each school district's special education plan shall include procedures for the education of all students with a disability who are residents of the district including those receiving special education in approved private schools and students with a disability who are nonresidents placed in private homes or institutions in the school district under sections 1305, 1306 and 1306.2 of the Public School Code of 1949 (24 P. S. §§ 13-1305, 13-1306 and 13-1306.2).

(d) Each intermediate unit shall prepare annually and submit to the Secretary a special education plan specifying the special education services and programs to be operated by the intermediate unit. The Secretary will prescribe the format, content and time for submission of the intermediate units' plans.

(e) Each early intervention agency shall develop an early intervention special education plan every 3 years.

(f) The Department will approve plans in accordance with the following criteria:

(1) Services and programs are designed to meet the needs of students identified as children with disabilities within the school district or intermediate unit or eligible young children within the early intervention agency.

(2) The full range of services and programs under this chapter are available to children with disabilities and eligible young children.

(3) The plan meets the specifications defined in this chapter and the format, content and time for submission of the agency plans prescribed by the Secretary.

(g) Portions of the plans that do not meet the criteria for approval will be disapproved. Prior to disapproval, Department personnel will discuss disapproved portions of the plan and suggest modifications with appropriate intermediate unit or school district personnel. Portions of the plan that are not specifically disapproved will be deemed approved.

(h) When a portion of an intermediate unit, school district or early intervention plan is disapproved, the Department will issue a notice specifying the portion of the plan disapproved, and the rationale for the disapproval and the opportunity for a hearing under 2 Pa.C.S. §§ 501—508 and 701—704 (relating to the Administrative Agency Law) and 1 Pa. Code Part II (relating to General Rules of Administrative Practice Procedure). If requested, the Department will convene a hearing within 30-days after the receipt of the request. The Department will render a decision within 30-days following the hearing.

### CHILD FIND, SCREENING AND EVALUATION

### § 14.121. Child find.

(a) In addition to the requirements incorporated by reference in 34 CFR 300.125(a)(1)(i) (relating to child find), each school district shall adopt and use a public outreach awareness system to locate and identify children thought to be eligible for special education within the school district's jurisdiction.

(b) Each school district shall conduct awareness activities to inform the public of its early intervention and special education services and programs and the manner in which to request services and programs.

(c) Each school district shall provide annual public notification, published or announced in newspapers or other media, or both, with circulation adequate to notify parents throughout the school district of child identification activities and of the procedures followed to ensure confidentiality of information pertaining to students with disabilities or eligible young children in accordance with this chapter.

### § 14.122. Screening.

(a) Each school district shall establish a system of screening to accomplish the following:

(1) Identify and provide initial screening for students prior to referral for a special education evaluation.

(2) Provide peer support for teachers and other staff members to assist them in working effectively with students in the general education curriculum.

(3) Conduct hearing and vision screening in accordance with section 1402 of the Public School Code of 1949 (24 P. S. § 14-1402) for the purpose of identifying students with hearing or vision difficulty so that they can be referred for assistance or recommended for evaluation for special education.

(4) Identify students who may need special education services and programs.

(b) Each school district shall implement a comprehensive screening process. School districts may implement instructional support according to Department guidelines or an alternative screening process. School districts which elect not to use instructional support for screening shall develop and implement a comprehensive screening process that meets the requirements specified in subsections (a) and (c).

(c) The screening process shall include:

(1) For students with academic concerns, an assessment of the student's functioning in the curriculum including curriculum-based or performance-based assessment.

(2) For students with behavioral concerns, a systematic observation of the student's behavior in the classroom or area in which the student is displaying difficulty.

(3) An intervention based on the results of the assessments under paragraph (1) or (2).

(4) An assessment of the student's response to the intervention.

(5) A determination as to whether the student's assessed difficulties are due to a lack of instruction or limited English proficiency.

(6) A determination as to whether the student's needs exceed the functional ability of the regular education program to maintain the student at an appropriate instructional level.

(7) Activities designed to gain the participation of parents.

(d) If screening activities have produced little or no improvement within 60 school days after initiation, the student shall be referred for evaluation under § 14.123 (relating to evaluation).

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)**
**Exhibit 2 to Complaint**

(e) Screening activities do not serve as a bar to the right of a parent to request an evaluation, at any time, including prior to or during the conduct of screening activities.

§ 14.123. Evaluation.

(a) The group of qualified professionals, which reviews the evaluation materials to determine whether the child is a child with a disability under 34 CFR 300.534(a)(1) (relating to determination of eligibility), shall include a certified school psychologist when evaluating a child for autism, emotional disturbance, mental retardation, multiple disabilities, other health impairments, specific learning disability or traumatic brain injury.

(b) In addition to the requirements incorporated by reference in 34 CFR 300.531—300.535, the initial evaluation shall be completed and a copy of the evaluation report presented to the parents no later than 60 school days after the agency receives written parental consent.

§ 14.124. Reevaluation.

(a) The group of qualified professionals, which reviews the evaluation materials to determine whether the child is a child with a disability under 34 CFR 300.536 (relating to reevaluation), shall include a certified school psychologist when evaluating a child for autism, emotional disturbance, mental retardation, multiple disabilities, other health impairment, specific learning disability and traumatic brain injury.

(b) In addition to the requirements incorporated by reference in 34 CFR 300.536 (relating to reevaluation), a reevaluation report shall be provided to the parents within 60 school days from the date that the request for reevaluation was received from the parent or teacher, or from the date that a determination is made by the agency that conditions warrant a reevaluation.

(c) Students with disabilities who are identified as mentally retarded shall be reevaluated at least once every 2 years.

## IEP

§ 14.131. IEP.

(a) In addition to the requirements incorporated by reference, the following provisions apply to IEPs:

(1) Copies of the comprehensive evaluation report shall be disseminated to the parents at least 10 school days prior to the meeting of the IEP team. A parent may waive this provision.

(2) The IEP of each student shall be implemented as soon as possible but no later than 10 school days after its completion.

(3) If a student with a disability moves from one school district in this Commonwealth to another, the new district shall implement the existing IEP to the extent possible or shall provide the services and programs specified in an interim IEP agreed to by the parents. The interim IEP shall be implemented until a new IEP is developed and implemented or until the completion of due process proceedings under this chapter.

(4) If a student with a disability moves into a school district in this Commonwealth from another state, the new school district may treat the student as a new enrollee and place the student into regular education and it is not required to implement the student's existing IEP.

(5) Every student receiving special education and related services provided for in an IEP developed prior June 9, 2001, shall continue to receive the special education

and related services under that IEP subject to the terms, limitations and conditions set forth in law.

(b) In addition to the requirements incorporated by reference in 34 CFR 300.29, 300.344(b) and 300.347(b) (relating to transition services; IEP team; and content of IEP), each school district shall designate persons responsible to coordinate transition activities.

§ 14.132. ESY.

This section sets forth the standards for determining whether a student with disabilities requires ESY as part of the student's program.

(1) At each IEP meeting for a student with disabilities, the school districts shall determine whether the student is eligible for ESY services and if so, make subsequent determinations about the services to be provided.

(2) In considering whether a student is eligible for ESY services, the IEP team shall consider the following factors, however, no single factor will be considered determinative:

(i) *Regression*—whether the student reverts to a lower level of functioning as evidenced by a measurable decrease in skills or behaviors which occurs as a result of an interruption in educational programming.

(ii) *Recoupment*—whether the student has the capacity to recover the skills or behavior patterns in which regression occurred to a level demonstrated prior to the interruption of educational programming.

(iii) Whether the student's difficulties with regression and recoupment make it unlikely that the student will maintain the skills and behaviors relevant to IEP goals and objectives.

(iv) The extent to which the student has mastered and consolidated an important skill or behavior at the point when educational programming would be interrupted.

(v) The extent to which a skill or behavior is particularly crucial for the student to meet the IEP goals of self-sufficiency and independence from caretakers.

(vi) The extent to which successive interruptions in educational programming result in a student's withdrawal from the learning process.

(vii) Whether the student's disability is severe, such as autism/pervasive developmental disorder, serious emotional disturbance, severe mental retardation, degenerative impairments with mental involvement and severe multiple disabilities.

(3) Reliable sources of information regarding a student's educational needs, propensity to progress, recoupment potential and year-to-year progress may include the following:

(i) Progress on goals in consecutive IEPs.

(ii) Progress reports maintained by educators, therapists and others having direct contact with the student before and after interruptions in the education program.

(iii) Reports by parents of negative changes in adaptive behaviors or in other skill areas.

(iv) Medical or other agency reports indicating degenerative-type difficulties, which become exacerbated during breaks in educational services.

(v) Observations and opinions by educators, parents and others.

**Elizabeth D. v. Colonial Area S.D. (E.D. Pa.)**
**Exhibit 2 to Complaint**