Pennsylvania
# Special Education Hearing Officer

DECISION

Child's Name:  ED

Date of Birth:   xx/xx/xx

Dates of Hearing:  5/1/09, 6/3/09, 6/29/09,
6/30/09, 7/1/09, 7/13/09

CLOSED HEARING

ODR No.  9777/08-09 AS

| Parties to the Hearing: | Representative: |
|---|---|
| Parents<br>Mr. & Mrs. | Parent Attorney:<br>Catherine Reisman, Esq.<br>Reisman Carolla LLP<br>19 Chestnut Street<br>Haddonfield NJ 08033-1810 |
| School District<br>Colonial<br>230 Flourtown Road<br>Plymouth Meeting, PA 19462-1252 | School District Attorney<br>Sarah Davis, Esq.<br>Sweet, Stevens, Katz & Williams<br>331 Butler Avenue, P.O. Box 5069<br>New Britain, PA 18901 -0934 |

Date Record Closed:              August 14, 2009

Date of Decision:               August 29, 2009

Hearing Officer:              Anne L. Carroll, Esq.

# INTRODUCTION AND PROCEDURAL HISTORY

Student enrolled in the Colonial School District as a kindergarten student in the 2006/2007 school year. At the request of Student's teacher, the District's Student Support Team began discussing Student's immaturity and slow progress in November 2007. When concerns about Student's academic progress were not resolved through that process, Student was evaluated for a speech/language impairment in January 2007 and found to be IDEA eligible. Soon after Student's initial IEP was implemented, the SST team recommended a comprehensive psycho-educational evaluation, resulting in a first grade IEP that provided for additional special education services, including part-time learning support and social skills training. Student was reevaluated by the District during the summer of 2008, and Student's Parents also obtained two independent psycho-educational evaluations in that period, resulting in recommendations for additional goals and services in second grade.

When the parties were unable to reach an agreement on an IEP for the 2008/2009 school year by mid-August 2008, Student's Parents withdrew Student from the District and enrolled Student in a private school. In March 2009, Parents filed a due process complaint to seek tuition reimbursement, compensatory education for the 2006/2007 and 2007/2008 school years and for the District's alleged failure to provide appropriate ESY services to Student in 2008.

The due process hearing was held over six sessions between May 1 and July 13, 2009. For the reasons explained below, Parents' claims for tuition reimbursement and compensatory education are denied.

# ISSUES

1. Did the Colonial School District violate its child find obligations by failing to evaluate Student prior to January 2007 to determine that Student is IDEA eligible and provide special education services to Student prior to March 2007 and/or by concluding that Student does not have a specific learning disability?

2. Is Student entitled to an award of compensatory education for Colonial School District's failure to provide Student with FAPE at any time during the 2006/2007 and/or 2007/2008 school years, and/or the summer of 2008, and if so, for what period(s), in what amount and in what form?

3. Are Studen 's Parents entitled to reimbursement for the private school tuition they paid for the 2008/2009 school year?

# **FINDINGS OF FACT**

A. Background/Evaluations/Eligibility

1.   Student is an elementary aged child, born xx/xx/xx. Student is a resident of the Colonial School District and is eligible for special education services. (Stipulation, N.T. p. 17)

2.   Student has a current diagnosis of speech/language impairment in accordance with Federal and State Standards.  34 C.F.R. §300.8(a)(1), (c)(11);  22 Pa. Code §14.102 (2)(ii); (Stipulation, N.T. p.18)

3.   Student's kindergarten teacher expressed concerns about Student's academic skills early in Student's kindergarten year, as did Student's Parents.  In November, 2006, the teacher discussed her concerns with the school's Student Support Team (SST), resulting in suggestions for interventions.  (N.T. pp. 401, 404, 405, 408, 421, 620, 621;  S-15)

4.   In January 2007, the District sought and was granted permission to conduct a speech/language evaluation, which resulted in the conclusion that Student is IDEA eligible due to a speech/language impairment affecting both receptive and expressive language and placing Student significantly below Student's same-age peers in language skills.  (N.T. pp. 408, 410, 1437—1440;  S-2, S-3)

5.   By March 2007, because the SST team was concerned that Student's language impairment continued to interfere with Student's academic, social and behavior progress despite speech/language therapy and the supports and services provided the regular education kindergarten classroom, the District sought and received Parents' permission to conduct a comprehensive psycho-educational evaluation.  The school psychologist completed the evaluation during the remainder of the 06/07 school year and produced a report dated August 7, 2007.  (N.T. pp. 408, 411, 413, 476, 477, 506; S-4)

6.   The District's school psychologist administered a number of standardized assessments designed to estimate Student's overall cognitive ability, measure Student's processing abilities related to reading and Student's academic achievement, specifically, the WPPSI-III (Wechsler Preschool and Primary Scale of Intelligence-Third Edition), CTOPP (Comprehensive Test of Phonological Processing), WIAT-II (Wechsler Individual Achievement Test-Second Edition) and WJ-III (Woodcock-Johnson Tests of Achievement-Third Edition).  (S-4)

3

7.      The test results placed Student's cognitive functioning overall in the low to below average range, with low average verbal skills and below average to borderline/moderately below average nonverbal performance skills.  Student's scores on the standardized achievement measures ranged from average to moderately below average, with several scores in the low average range.  The CTOPP placed Student's phonological processing skills in the poor range.  (N.T. pp. 482—484, 489, 507, 517, 518; S-4)

8.      The evaluator noted that although the validity of the test results was not affected, Student's distractibility and attention difficulties during testing may have resulted in slightly underestimating Student's cognitive abilities.  (N.T. pp. 479, 480, 483—487, 491, 507; S-4, S-5)

9.      The District psychologist also assessed Student's behavior and social functioning using the BASC-II  (Behavior Assessment System for Children-Second Edition) and Connors Rating Scale for ADHD (attention deficit/hyperactivity disorder).  Although she found no significant school behavior concerns, Parents' and teachers' ratings were significantly elevated in the areas of inattention, learning problems and hyperactivity.  (N.T. pp. 521—524; S-4, S-5)

10.     Based upon the evaluation results, the psychologist identified significant academic needs, as well as needs in the areas of attention, focus and independence, recommending that specially designed instruction be provided in those areas.  Student's IEP team concluded that Student should receive part-time learning support in 1st grade for instruction in reading, math, writing; that Student's  IEP should address Student's attention/behavior needs, as well as continue to include language goals along with speech/language therapy.  (N.T. pp. 527, 528; S-4, S-5)

11.     In May 2008 and April 2009, Student's Parents obtained an independent educational evaluation which confirmed the results of the District's evaluations in both results and observations of Student's distractibility and attention issues during testing. (N.T. pp. 152—155, 173—175, 554, 555; P-5)

12.     In August 2008 Parents also obtained an evaluation from a play therapist to address their concerns about Student's social immaturity.  The evaluator noted Student's difficulties with sustaining attention to play themes, engaging in reciprocal conversation and transitioning from one activity to another.  She also noted an issue with body-space awareness that might indicate sensory needs.   (N.T. pp. 43--49; P-7)

13.     During the summer of 2008, the District conducted a reevaluation of Student including a WISC-IV (Wechsler Intelligence Scale for Children-Fourth Edition) and standardized achievement tests.  At that evaluation session, the District's school psychologist noted some improvement in Student's ability to remain seated, attend and focus on the tasks, although Student was again distractible.  As with the previous testing, the attention factor may have resulted in underestimating Student's cognitive abilities.  (N.T. pp. 509—512, 537; S-9)

14.     The FSIQ (Full Scale IQ) yielded by the WISC-IV was consistent with the results of the WPPSI-III, placing Student's functioning overall upper end of the borderline range.  There was, however, more scatter in the subtest scores.  Student's score on the Verbal Comprehension Index

was in the average range, while Perceptual Reasoning was in the borderline range. Working Memory and Processing Speed results were in low average range. (N.T. p. 510; S-9, p. 15)

15.     In June 2008, Student was also reevaluated by a school psychologist employed by a Pennsylvania Intermediate Unit, but who was serving as a private, independent evaluator for that purpose. He administered the RIAS (Reynolds Intellectual Abilities Scale), an assessment of cognitive potential that minimizes language, processing speed and working memory demands. Testing yielded a Composite IQ of 97, a Verbal Index score of 105 and a Nonverbal Index score of 89. Based upon his clinical judgment, his own research into test correlations and his belief that the difference between the Verbal and Nonverbal Index scores is so statistically significant that the composite IQ score is meaningless, the psychologist opined that the Verbal Index Score is most representative of Student's overall potential in school. (N.T. pp. 1178, 1181, 1182, 1230—1236, 1239, 1240; S-11)

16.     The psychologist also administered several other tests that measured aspects of intellectual and social/behavioral functioning, all of which yielded below average scores. He determined that Student has language-based specific learning disabilities based upon the discrepancy between Student's Verbal Index score and those test results (N.T. pp. 1190—1196, 1238, 1241, 1249, 1250, 1296; S-11)

17.     The independent evaluator also concluded that Student's language impairments interfere with Student's acquisition of academic skills and social development. (N.T. pp. 1199, 1200, 1277; S-11)

18.     At Parents' request, the District provided an independent OT evaluation consisting of the SIPT (Sensory Integration and Praxis Test), which was completed in August 2008. The test results indicated that Student's greatest problems were in areas with higher visual components such as spatial visualization, design copying, manual form perception and figure-ground discrimination School-related recommendations based upon the SIPT results included preferential seating, decreasing distractions, repetition of directions, heightened sensory feedback, swivel chair, sensory processing activities, large movement sensory breaks. (N.T. pp. 274, 1572, 1574, 1594; S-12)

B.  Interventions/Services/ Progress During the 2006/2007 School Year

19.     The SST screens children in the early elementary years (K-3) who are struggling with school-related skills and develops strategies to support the classroom teacher in addressing the identified needs within the classroom. (N.T. pp. 446, 447, 449, 450, 732, 790, 791, 1429)

20.     On November 9, 2006, the SST team met to discuss Student's progress and the areas of concern that Student's teacher identified, including immature language and social skills, difficulties with math, fine motor skills and inattention/staying on task. At the time of the SST referral On October 20, 2006, Student could not draw a recognizable picture or write Student's name, although Student could produce some letters. (N.T. pp. 404, 407, 622, 643, 1434, 1435; S-15)

21.     Interventions already in place for Student included working in a small group with a reading specialist, 1:1 instruction, additional time on task, parent conferences, extra handwriting practice.  (N.T. pp. 405, 406, 623, 625; S-15)

22.     The SST recommended focusing on "Kid Writing" to address Student's oral and written expression, with significant 1:1 support to encourage Student to draw a picture while dictating a sentence about it. Kid Writing is a research-based program that focuses on phonemic awareness, initial sounds and letter writing.  Student was also referred for speech and OT screenings.  (N.T. pp. 408, 411, 412, 1435, 1436; S-15)

23.     The initial speech/language support IEP developed for Student in early March 2007 included goals designed to increase Student's ability to follow directions, relate Student's own experiences, retell stories and correctly use graphical morphemes (plurals, past tense).  Those skill areas affect development of early academic skills in reading, math and written expression. (N.T. pp. 1443, 1444, 1450; S-2)

24.     Special education services provided to Student in the initial IEP included six 30 minute sessions of speech/language therapy/month and modifications implemented in Student's regular kindergarten class, including small group instruction, use of graphic organizers to provide visual cues to support story telling, repetition, reinforcement of correct grammar by verbal praise and breaking directions into smaller steps.  Student made documented progress on Student's speech/language IEP goals during the rest of the kindergarten year.  (N.T. pp. 1445—1450 ; S-2, S-24, p. 19)

25.     The Parental input form for the second evaluation, submitted in April 2009, noted Student's progress in the 7 months since Student began kindergarten, including Student's ability to write Student's name and read some sight words.  (S-4)

26.     With Student's IEP modifications in place, Student's kindergarten report card reflected progress, as indicated by a Proficient  (PR) or Partially Proficient (PP) in many language-based skill areas.  Story retelling, name writing and recognizing high frequency sight words were especially notable areas of progress.  Progress in writing was also noted, but Student still struggled with most math skills.  (N.T. pp. 649—651, 658—663, 675; S-14, S-26, S-27, p. 11)

27.     By the end of kindergarten, Student was able to meet some of the District's kindergarten curriculum standards for math, reading and writing.  Student's inability to meet all such standards was the reason Student's first grade IEP (2007/2008 school year) provided for a learning support class rather than a regular education setting for those areas.  (N.T. pp. 665—672; S-38, S-39)

28.     Student also received predominantly Satisfactory (S) designations in the component skills under social skills and work habits.  (N.T. pp. 190—192; S-14)

6

C. Interventions/Services/Progress During the 2007/2008 School Year, Summer 2008

29.     The IEP provided for Student's 1st grade year included goals for reading, math, written expression, attention/ behavior and speech/language. (N.T. pp. 457, 1452, S-5)

30.     Student's academic needs in reading, math and written expression were addressed through speech/language therapy as well as direct instruction in a learning support class, often on a 1:1 basis. (N.T. pp. 884—905, 914—919, 926—930, 934, 935, 1456—1458; S-27)

31.     Student's learning support teacher provided numerous creative instructional strategies to address Student's academic needs, engage Student's in the learning process and reduce the effects of Student's attention difficulties. (N.T. pp. 886—905, 918, 996, 997; S-27, pp. 26—30)

32.     When Student's behaviors began interfering with instruction, the learning support teacher developed and successfully implemented behavior interventions to address those issues to the extent possible.  Neurologically-based behaviors, such as hyperactivity and impulsiveness, which Student exhibited, cannot be entirely eliminated by classroom behavior interventions.  The behavior strategies were directed toward classroom behaviors, such as work refusal, that could be changed with good management. (N.T. pp. 806—809, 909—911, 914, 986—990; S-17)

33.     The learning support program Student received during the 2007/2008 school year provided specially designed instruction in areas recommended in the August 2008 report from Parents' independent evaluator. (N.T. pp. 1303, 1304, 1306, 1308, 1310; S-5, S-8, S-11)

34.     Although no specific social skills needs were identified for Student in the August 2007 evaluation report, there were ongoing concerns about Student's immaturity.  Social skills needs were addressed through guidance lessons provided in the regular education classroom and participation in a lunch group.  Student's social skills increased, but Student remained immature in comparison to Student's 1st grade classmates, prompting consideration of whether Student's 2nd grade regular education inclusion should be with 1st or 2nd grade during the 2008/2009 school year. (N.T. pp. 419, 420, 768—771, 813, 863, 1011, 1012; S-4, S-5)

35.     An occupational therapist under contract with the District visited Student's 1st grade learning support class weekly for consultation on sensory integration and handwriting strategies.  Although the OT was there to assist all students in the class, Student's teacher frequently requested strategies specifically for Student. (N.T. pp. 809, 991—994, 1556, 1560—1562, 1575)

36.     Student's 1st grade program incorporated sensory strategies that were later recommended in the SIPT evaluation. (N.T. pp. 1576—1578, 1596, 1604, 1607, 1608; S-5, S-12)

37.     The learning support teacher kept extensive notes and progress monitoring data documenting  strategies and Student's progress during Student's 1st grade year.  Student's progress accelerated toward the end of the school year, in April and May 2008. (N.T. pp. 737, 738, 810—812, 814—818, 894, 905, 930—941, 943, 945—982, 998; P-1, p. 13S-16, S-17, S-18, S-25, S-26, S-27)

38.     Student continued to receive speech/language therapy during 1st grade.  Student's speech/language therapist maintained progress monitoring data throughout the 2007/2008 school year, which demonstrated progress.  Student's progress toward the speech/language goals in the kindergarten IEP was reported in the 1st grade IEP.  (N.T. pp.1450—1454; S-2, S-5, pp. 16, 17, S-24)

39.     The District initially considered Student ineligible for ESY services during the summer of 2008, but reconsidered its decision at Parents' request.  Although a final decision concerning ESY eligibility was never formally reached, the District subsequently offered a NOREP in reading during the summer of 2008.  The District provided for Student's participation in one of its regular summer programs for reading instruction, but Student was accompanied by a certified teacher to provide 1:1 support, since Student's reading levels were lower than usually required for that program.  During the summer program, Student worked on both reading and writing skills and made progress on both the skills taught and in working independently.  (N.T. pp. 236, 237, 240, 241, 252, 253, 259, 756, 757, 760—762, 771—773, 848, 850, 851, 854—856, 944, P-41, S-6, S-8, p. 26, S-19)

   D.   IEP Offered for the 2008/2009 School Year

40.     The final IEP offered by the District for the 2008/2009 school year was sent to Parents on August 21, 2008 before school opened.  It included revisions of the IEP draft discussed at an August 11, 2008 IEP meeting with final revisions incorporating new information and the concerns Parents expressed in an August 14, 2008 letter.  (N.T. pp. 1058—1074, 1144, 1148—1153, 1469; P-29, S-31)

41.     Goals and specially designed instruction included in an earlier draft of the District's proposed IEP for the 2008/2009 school year encompassed all of the recommendations included in the August 2008 report from Parents' independent evaluator.  (N.T. pp. 1303, 1304, 1306, 1308, 1310; S-8, S-11)

42.     The final 2008/2009 IEP offer by the District included 27 separate goals encompassing the areas of language, reading, written expression, math, social skills, behavior, fine motor skills and sensory needs, accompanied by an extensive list of specially designed instruction and modifications.  (N.T. pp. 1070—1074, 1469; S-31)

43.     The proposed IEP continued the same level of speech/language therapy provided since Student's first IEP.  (S-31)

44.     The District's final 2008/2009 IEP proposal incorporated OT goals and specially designed instruction to address sensory issues in the learning support classroom, including recommendations from the SIPT evaluation.  The proposed IEP also included 60 minutes/month of OT as a related service, including direct or consultative services  (N.T. pp. 1575, 1577, 1579—1581, 1589, 1590, 1597, 1598; S-31)

## **DISCUSSION AND CONCLUSIONS OF LAW**

    A.  Compensatory Education Issues

        1.  FAPE Legal Standards

Under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1400, *et seq.*, and in accordance with 22 Pa. Code §14 and 34 C.F.R. §300.300, a child with a disability is entitled to receive a free appropriate public education (FAPE) from the responsible local educational agency (LEA) in accordance with an appropriate IEP, *i.e.*, one that is "reasonably calculated to yield meaningful educational or early intervention benefit and student or child progress." *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034 (1982); *Daniel S. v. Council Rock School District*, 2007 WL 3120014 (E.D.Pa. 2007). "Meaningful benefit" means that an eligible child's program affords him or her the opportunity for "significant learning." *Ridgewood Board of Education v. N.E.*, 172 F.3d 238 (3RD Cir. 1999). Consequently, in order to properly provide FAPE, the child's IEP must specify educational instruction designed to meet his/her unique needs and must be accompanied by such services as are necessary to permit the child to benefit from the instruction. *Rowley; Oberti v. Board of Education*, 995 F.2d 1204 (3rd Cir. 1993). An eligible student is denied FAPE if his program is not likely to produce progress, or if the program affords the child only a "trivial" or "*de minimis*" educational benefit. *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F. 2d 171 (3rd Cir. 1988).

Under the interpretation of the IDEA statute established by *Rowley* and other relevant cases, an LEA is <u>not</u> required to provide an eligible child with services designed to provide the "absolute best" education or to maximize the child's potential. *Carlisle Area School District v. Scott P.*, 62 F.3d 520 (3rd Cir. 1995); *School Dist. of Philadelphia v. Deborah A.*, 2009 WL 778321 (E.D.Pa., 2009).

9

2.	Child Find

Both the federal IDEA and Pennsylvania special education regulations require school districts to identify children who may be eligible for special education services and evaluate them to determine eligibility.   34 C.F.R. §300.111; *Lauren W. v. DeFlaminis*, 480 F.3d 259 (3rd Cir. 2007*); Annika T. v. Unionville Chadds-Ford School District,* 2009 WL 778350 (E.D.Pa. 2009);  *A.P. v. Woodstock Bd. of Education*, 572 F.Supp.2d 221 (D.Conn. 2008); *Charlotte-Mecklenburg Bd. of Educ. v. B.H.*, 2008 WL 4394191 (W.D.N.C. 2008); 22 Pa. Code §§14.121, 122.

In accordance with §14.122 of the Pennsylvania special education regulations, a school district must screen all students in certain areas as the first step in identifying children potentially eligible for special education services, and may try early classroom interventions to determine whether concerns can be resolved before proposing an IDEA evaluation to explore suspected areas of need in detail.

The version of §14.122 in effect at the time the claims in this case arose provided as follows with respect to the initial identification of potentially eligible students:

   Screening.

   (a) Each school district shall establish a system of screening to accomplish the following:

   (1) Identify and provide initial screening for students prior to referral for a special education evaluation.

   (2) Provide peer support for teachers and other staff members to assist them in working effectively with students in the general education curriculum.

   (3) Conduct hearing and vision screening in accordance with section 1402 of the Public School Code of 1949 (24 P. S. § 14-1402) for the purpose of identifying students with hearing or vision difficulty so that they can be referred for assistance or recommended for evaluation for special education.

(4) Identify students who may need special education services and programs.

(b) Each school district shall implement a comprehensive screening process. School districts may implement instructional support according to Department guidelines or an alternative screening process. School districts which elect not to use instructional support for screening shall develop and implement a comprehensive screening process that meets the requirements specified in subsections (a) and (c).

(c) The screening process shall include:

(1) For students with academic concerns, an assessment of the student's functioning in the curriculum including curriculum-based or performance-based assessment.

(2) For students with behavioral concerns, a systematic observation of the student's behavior in the classroom or area in which the student is displaying difficulty.

(3) An intervention based on the results of the assessments under paragraph (1) or (2).

(4) An assessment of the student's response to the intervention.

(5) A determination as to whether the student's assessed difficulties are due to a lack of instruction or limited English proficiency.

(6) A determination as to whether the student's needs exceed the functional ability of the regular education program to maintain the student at an appropriate instructional level.

(7) Activities designed to gain the participation of parents.

(d) If screening activities have produced little or no improvement within 60 school days after initiation, the student shall be referred for evaluation under § 14.123 (relating to evaluation).

(e) Screening activities do not serve as a bar to the right of a parent to request an evaluation, at any time, including prior to or during the conduct of screening activities.

3.     Screening/Evaluations/Identification

Parents suggested throughout the hearing in this case that the District acted improperly by first referring Student to the school's SST to address the concerns identified by both Student's teacher and Student's Mother early in Student's kindergarten year. They contend that the SST process was insufficient and improperly delayed an evaluation that would have identified

11

Student's speech/language impairment, thereby delaying special education services to address the needs arising from Student's disability.

Parents further argue that by limiting the initial evaluation to speech/language, the District deprived Student of additional services to address Student's academic difficulties and improve Student's immature social skills. Finally, Parents contend that by not permitting them to participate in the SST process, or even notify them that it was occurring, the District deprived them of their rights under the IDEA.

The latter argument was asserted in support of Parents' contention that they should be permitted to seek compensatory education to the beginning of the 2006/2007 school year, rather than from March 2, 2007, two years before the complaint in this case was filed.[1] Parents contend that the District's alleged procedural violations with respect to the screening process should be deemed to extend the limitation periods in this case. It is, however, unnecessary to discuss in detail whether Parents' claims prior to March 2, 2007 are barred, or, indeed, whether procedural violations occurred. A determination that FAPE was denied must be based on substantive grounds, 34 C.F.R. §300.513. The evidence establishes that the District's procedures did not result in a deprivation of educational benefit to Student as Parents contend.

With respect to the pre-evaluation screening process, there is a sometimes delicate balance between allowing sufficient time for reasonable attempts to address concerns through teaching methods and other classroom strategies and an unwarranted delay in referring a child for an evaluation. When interventions in the regular classroom do not lead to sufficient

---

[1] When IDEA was re-authorized in 2004, it included amendments limiting the contents of due process complaints to "…a violation that occurred not more than two years before the date the parent or public agency knew or should have known of the alleged action which forms the basis of the complaint." 20 U.S.C. §1415(b)(6)(B); 34 C.F.R. §300.507(a)(2). In addition, a request for a hearing must be made "within two years of the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. §1415(f)(3)(C); 34 C.F.R. §300.511(e).

improvement within a reasonable time, a district is required to seek parental permission to evaluate. In the version of §14.122 that was in effect in 2006 and 2007, the appropriate time for assessing the effectiveness of screening activities was set at 60 days. Here, although Parents correctly noted that Student was not referred for a complete psycho-educational evaluation until March 2007, their argument that Student was not timely evaluated ignores the speech/language evaluation in January 2007 which initially established Student's IDEA eligibility. (F.F. 4)

Although Student's needs resulting from Student's receptive and expressive language impairment were ultimately determined to be significant, it must be noted that Student entered kindergarten just three months after Student's 5th birthday, at the younger end of the age spectrum for beginning kindergarten. In addition, as noted by Student's kindergarten teacher, developmental levels of students entering kindergarten students are quite variable. (N.T. pp. 648, 652--654) Just as the appropriateness of an IEP must be determined at the time it was offered, not in light of subsequent developments, the District's actions with respect to evaluating Student must be judged in terms of what its staff knew and observed during the 06/07 school year as it unfolded and their knowledge of Student grew, not based upon what they learned from later evaluations. *See, School District of Philadelphia v. Deborah A.*, 2009 WL 778321 at *7, citing *Fuhrman v. Hanover Board of Education*, 993 F.2d 1031, 1040 (3rd Cir. 1993). Moreover, when interventions are put in place, it takes some time to determine their effectiveness, including whether small adjustments will result in improvements.

The record in this case establishes that the District did not ignore either Student's functioning in school or Student's Parents' concerns. It screened, intervened, evaluated, added speech/language support and additional classroom supports, and evaluated again during the same school year as it became apparent that Student needed more services to make meaningful

13

progress. (F.F. 3, 4, 5, 6, 10   Moreover, the elementary school counselor, who attended the first parent-teacher conference in Student's kindergarten year, testified credibly and without contradiction that Parents preferred to defer an IDEA evaluation until informal classroom interventions were attempted.  (N.T. pp. 401, 402)  The counselor further testified that she explained the option of referring Student to the Student Support Team to Parents at the time and they approved it.  (N.T. p. 402)   Parents offered no testimony to the contrary.  S*ee*, N.T. pp. 1111—1166.

    Parents' preference would not relieve the District of its child find obligations, but that circumstance, along with the District's reasonable steps to address Student's early academic problems followed by two formal evaluations lends additional support to the conclusion that the District did not violate its child find obligations in the 2006/2007 school year.

    Based upon the opinion of the second of the independent school psychologists who evaluated Student, Parents argued that a second child find violation arose from the District's failure to identify specific learning disabilities as Student's primary eligibility category.  The means by which the psychologist reached his conclusion that Student's IDEA eligibility is actually due specific learning disabilities was both highly unusual and thoroughly unpersuasive.  The most important factor in rejecting Parents' contention that speech/language impairment is an inaccurate eligibility category, however, was the psychologist's inability to identify any substantive difference changing the category would have made with respect to either the program and placement provided for Student during the 2007/2008 school year or the District's proposals for the 2008/2009 school year.  The independent evaluator agreed that Student's language impairment was the most significant factor in limiting Student's academic achievement, and

14

admitted that the specially designed instruction provided in both the past and proposed District IEPs were completely in accord with his recommendations. (F.F. 33, 41)

    4.  Services/Progress During the 2006/2007 School Year

Although Student was not at the levels expected of a typical student at the end of kindergarten in terms of standardized assessments of achievement, Student is not a typical student. Despite the severity of Student's language disability and the significant needs resulting from it, which did not become apparent until Student was faced with the demands of academic tasks, Student made significant progress as reflected in both Student's kindergarten report card and Student's Mother's assessment that Student had "come a long way" since the beginning of the school year.  S-4, p. 2; S-14)

    5.  Services/Progress During the 2007/2008 School Year/ESY

Student received special education services during Student's 1st grade year that effectively addressed Student's language, academic, behavior and sensory needs. (F.F. 29, 30) Student's learning support classroom and speech/language therapy provided small group and 1:1instruction and a supportive learning environment. (F.F. 31, 34, 35) Although Student's speech/language impairment, attention difficulties and sensory needs interfered with academic learning, Student made slow but steady progress that increased toward the end of the 2007/2008 school year. (F.F. 37) There is extensive evidence that Student's 1st grade IEP was reasonably calculated to assure progress commensurate with Student's ability and Student's needs, and that Student was able to derive meaningful benefit from Student's education. It is unrealistic to expect that Student would finish the 2007/2008 school year at grade level in light of Student's significant needs and does not negate the conclusion that the District provided an appropriate program for Student.

Although the District could have planned earlier for ESY services for the summer of 2008, Student did receive appropriate services in reading and was able to consolidate and even increase Student's skills through the summer reading program.

The record in this case provides no basis for an award of compensatory education for any portion of the 2006/2007 school year, for the 2007/2008 school year of for the summer of 2008.

### B.  Tuition Reimbursement

#### 1.  Legal Standards

In *Burlington School Committee v. Department of Education of Massachusetts*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the United States Supreme Court established the principle that parents do not forfeit an eligible child's right FAPE, to due process protections, or to any other remedies provided by the IDEA statute and regulations, by unilaterally selecting a placement other than that offered by the District.  Parents do, however, place themselves at financial risk.  Although parents are always perfectly free to decide upon the program/placement they believe will best meet their child's needs, to obtain public funding for that choice, they must meet well-established legal requirements

To determine whether parents are entitled to reimbursement from their school district for special education services provided to an eligible child at their own expense, a three part test is applied based upon the *Burlington School Committee* case.  The first step is to determine whether the program and placement offered by the district is appropriate for the child.  Only if that issue is resolved against the district are the second and third steps considered, *i.e.*, is the program proposed by the parents appropriate for the child and, if so, whether there are equitable considerations that counsel against reimbursement or affect the amount thereof.  *See also,*

*Florence County School District v. Carter*, 510 U.S. 7, 15, 114 S. Ct. 361, 366, 126 L. Ed. 2d 284 (1993); *Lauren W. v. DeFlaminis,* 480 F.3d 259 (3rd Cir. 2007).

    2. Appropriateness of the IEP offered for the 2008/2009 School Year

There was considerable testimony at the hearing concerning IEP meetings during the spring and summer of 2008 leading to the District's final IEP offer for the 2008/2009 school year, transmitted via letter dated August 21, 2008. (F.F. 40; S-31) Parent candidly testified that she could find no deficiency in the IEP proposed by the District on August 21, 2008, and that an earlier rejected draft also included goals and specially designed instruction directed toward addressing Parents' concerns and meeting Student's needs in the areas of attention and social skills. (N.T. pp. 1144, 1150, 1153) Parent noted, however, that it came late in the process, after Parents had already decided on the unilateral private placement. (N.T. p. 1152)

  The IDEA statute and regulations provide that school districts must have an IEP in effect for each eligible child at the beginning of each school year. 34 C.F.R. §300.323(a). There is no evidence that the District would not have met that standard if Parents had accepted the admittedly appropriate IEP offered on August 21, 2008. Indeed, Parent testified that the final IEP offer was received before the school year began. (N.T. p. 1152) Although Parents may have considered the District's final offer too late in terms of changing their plans for enrolling Student in private school, it complied with IDEA legal requirements in all respects. Moreover, the evidence established that the earlier draft of the proposed IEP also included goals that were reasonably calculated to meet Student's needs, and had already addressed Parents' concerns in many respects. (N.T. pp. 1135—1141, 1143, 1144 ; P-29, S-13, S-31) The final IEP offer explicitly incorporated the remaining concerns raised in Parents' August 13 letter. (N.T. pp. 1148--1151; P-29, S-31)

In light of the overwhelming evidence that the District offered an appropriate program and placement for Student for the 2008/2009 school year, Parents' claim for tuition reimbursement must be denied. There is no need, therefore, to consider the appropriateness of [redacted], the private school selected by Parents, or any equitable considerations that would preclude or reduce an award of tuition reimbursement. It is also unnecessary to rule on Parents' motion to shift the burden of proof on the issue of the appropriateness of the private placement based upon the District's refusal to permit an observation of the learning support classroom to which Student would have been assigned had Student remained enrolled in the District for the 2008/2009 school year.

## CONCLUSION

For the reasons explained above, Parents' claims will be denied in their entirety.

## ORDER

In accordance with the foregoing findings of fact and conclusions of law, it is hereby **ORDERED** that Parents' claims for compensatory education and tuition reimbursement are **DENIED.**

*Anne L. Carroll*
_____
Anne L. Carroll, Esq.
HEARING OFFICER

August 29, 2009