IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| E.D., *et al.*, | | |
| | Plaintiffs, | Civil Action |
| v. | | No. 09-cv-4837 |
| Colonial School District, | | |
| | Defendant. | Surrick, J. |

**PLAINTIFFS' MEMORANDUM OF LAW
REGARDING SUPPLEMENTAL AUTHORITY
IN FURTHER SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT FILED AUGUST 30, 2010 (ECF No. 17)
AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
FILED AUGUST 30, 2010 (ECF NO. 16)**

## I. INTRODUCTION

Pursuant to the Court's order entered March 23, 2017 (ECF No. 39), plaintiffs submit this supplemental memorandum of law in further support of Plaintiffs' Motion for Summary Judgment on Count I and Partial Summary Judgment on the Issue of Liability on Counts II and II of the Complaint ("*Pl. Mem.*"), ECF No. 17 and in opposition to Defendant's Motion for Summary Judgment, ECF No. 16.

## II. PROCEDURAL HISTORY

This case involves a dispute regarding educational services provided to E.D., a child with a disability entitled to special education under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA") and to the civil rights protections of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504") and the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"). In March, 2009, plaintiffs filed a complaint seeking a special education due process hearing with the Pennsylvania Office for Dispute Resolution. ECF No. 1 at 22. They sought tuition reimbursement for the 2008-2009 school year, and compensatory

education for the 2006-2007 and 2007-2008 school years, and the summer of 2008. Pennsylvania Special Education Hearing Officer Anne Carroll conducted 6 days of hearing in the summer of 2009 and issued her opinion on August 29, 2009. ECF No. 1 at 21. Plaintiffs filed a timely appeal with this Court on October 21, 2009.

On August 30, 2010, the parties filed cross-motions for judgment on the administrative record on Count I of the Complaint. In addition, plaintiffs filed a motion for partial summary judgment on the issue of liability on Counts II and III of the Complaint and defendant Colonial School District ("District") filed for summary judgment on Counts II and III. ECF Nos. 16, 17. The parties completed briefing on those motions on October 1, 2010. ECF No. 21, 22. In October and November of 2011 and February of 2016, the parties filed supplemental memoranda. ECF Nos, 25, 29, 34, 36.

This memorandum addresses the impact of the decision in *Endrew F. v. Douglas County Sch. Dist. RE-1*, 580 U.S. __, 2017 U.S. LEXIS 2025 (March 22, 2017) [1] on this matter.

### III. ARGUMENT

#### A. *Endrew F.* Rejected the "Soft Bigotry of Low Expectations" for Students with Disabilities

*Endrew F.* clarified the standard for a free appropriate public education ("FAPE") first enunciated in *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982). "To meet its substantive obligations under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."

---

[1] *Endrew F.*'s interpretation of IDEA applies to all currently pending cases. When the Supreme Court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Court's] announcement of the rule." *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993). The District cannot claim unfair surprise as the IEP requirements enforced by *Endrew F.* "have been in place since the time the States began accepting funding under the IDEA." *Endrew F.*, at *24.

2

2017 U.S. 2025, at *21. The Court went on to explain that *Rowley* sheds light on what is required. When a child is being educated in the general education curriculum as are her peers without disabilities, IDEA "requires an IEP that is reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 23. In short, IDEA is designed to address the discrimination that results from what the first President Bush called "the soft bigotry of low expectations." George W. Bush, Speech to NAACP, July 10, 2000 (available at http://www.washingtonpost.com/wp-srv/onpolitics/elections/bushtext071000.htm?tid=a_inl) (last visited March 29, 2017).

### B. The Hearing Officer Erred in Holding that the District's Programming Provided a FAPE

#### 1. The Program Provided by the District Was Not Appropriate in Light of E.D.'s Circumstances

*Endrew F.* clarifies that the talismanic recitation of a particular standard (such as "meaningful benefit") does not render an Individualized Educational Program ("IEP") appropriate.[2] Rather, the hearing officer, and federal courts reviewing administrative decisions, must determine whether the District followed the explicit "provisions governing the IEP development process." *Id.* at *23. "[T]he procedures are there for a reason, and their focus provides insight into what it means, for purposes of the FAPE definition, to 'meet the unique needs of a child with a disability. §§ 1401(9), (29)." *Id.* at *25. As discussed more fully below, unless a student is in the exceptionally small group of students with significant cognitive impairments who cannot be expected to meet grade level expectations, her IEP must aim toward grade level achievement.

---

[2] Although the hearing officer referred, in a conclusory manner, to "significant learning" and "meaningful benefit," she also stated that an eligible student "is denied FAPE if his program is not likely to produce progress, or if the program affords the child only a 'trivial' or '*de minimis*' educational benefit." *Op.* at 9, ECF No. 1 at 29. Thus, arguably she was in fact using the "more than merely *de minimis*" standard disapproved by *Endrew F.*

3

*Endrew F.* is consistent with guidance from the United States Department of Education in 2015. USDOE stated: "Research has demonstrated that children with disabilities who struggle in reading and mathematics can successfully learn grade-level content and make significant academic progress when appropriate instruction, services, and supports are provided. Conversely, low expectations can lead to children with disabilities receiving less challenging instruction that reflects below grade-level content standards, and thereby not learning what they need to succeed at the grade in which they are enrolled." United States Dep't of Educ., Dear Colleague Letter dated Nov. 16, 2015 ("2015 DCL") at 1, available at https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/guidanceon-fape-11-17-2015.pdf (last visited March 30, 2017). Only a "very small number of children with the most significant cognitive disabilities" should have their measured against alternate academic achievement standards. *Id.* at 5. For all other children, their IEPs must provide for instruction in a "curriculum that is based on a State's academic content standards for the grade in which [they are] enrolled." *Id.* at 3.

The hearing officer's own factual findings compel the conclusion that E.D. was not in the extremely small cohort of children whose goals should be aligned to alternate standards. The parents' private evaluator, who administered the Reynolds Intellectual Abilities Scale, secured results from E.D. that reflected a statistically significant disparity between E.D.'s verbal and nonverbal index scores. Because of that difference, he concluded that the Verbal Index Score of 105 was most representative of E.D.'s potential in school. *Op.* at 5, FF 15, ECF No. 1 at 24. A standard score of 100 is average,[3] so E.D. was solidly in the "average" range of intellectual

---

[3] *See* Samuel O. Ortiz, *et al.*, *Intellectual Ability and Assessment: A Primer for Parents and Educators* at 2, National Association of School Psychologists (2010), available at https://www.nasponline.org/Documents/Resources%20and%20Publications/Handouts/Families%20and%20Educators/Intellectual_Ability_and_Assessment.pdf (last visited March 29, 2017).

4

functioning. Likewise, the District's school psychologist concluded that E.D. had low average verbal skills (in 2007) and average verbal skills (in 2008). *Op.*, at 4, FF 7, 14, ECF No. 1 at 24. On both occasions, E.D.'s attention issues may have resulted in an underestimate of her abilities on her testing. *Id.*, FF 8, 13, ECF No. 1 at 24. Thus, in light of E.D.'s circumstances, average to low average verbal ability, her IEPs should have aimed for and provided instruction to enable her to meet the curriculum content standards applicable to her peers.

Again, notwithstanding her use of the word "meaningful benefit," the hearing officer's own factual findings compel the conclusion that E.D.'s IEP's did not comply with this explicit statutory requirement. Instead, the District program aimed for, and resulted in, "slow but steady progress" toward well below grade level expectations. *Op.* at 15, ECF No. 1 at 35. The hearing officer even acknowledged that she had set the bar too low, in contravention of the explicit provisions governing IEP development. Despite E.D.'s low average to average verbal abilities,[4] she found it "unrealistic to expect that E.D. would finish the 2007/2008 school year at grade level." This reasoning runs headlong in *Endrew F*. Setting the bar this low does "little to remedy the pervasive and tragic academic stagnation that prompted Congress to act." *Endrew F.*, at *21. As for the 2006-2007 school year, the hearing officer based her assessment of "significant progress" on a kindergarten report card[5] and her "Mother's assessment that she had come a long way" *Op.* at 15, ECF No. 1 at 35.

---

[4] On all testing, the District's school psychologist and the parents' independent evaluator found that E.D.'s nonverbal performance skills were below average, or moderately below average. *Id.* at 4, FF 7, 13 (perceptual reasoning in borderline range), 15 (nonverbal index score of 89).
[5] As discussed more fully *infra* at 8, non-testimonial extrinsic evidence establishes that E.D. in fact did not make progress in most language based skill areas in kindergarten.

Based on the hearing officer's factual findings, when measured against the metric approved by *Endrew F.* – did the District follow the explicit requirements for program development in the IDEA? – the programming in question here fails the test of appropriateness:

| | |
|---|---|
| A school district must construct the IEP "*only after careful consideration* of the child's present levels of achievement, disability, and potential for growth." *Endrew F.* at *22 (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv)) (emphasis supplied). | Notwithstanding her teacher's recognition of deficits in all academic areas, the January 2007 evaluation was limited to speech and language. *Op.* at 3, ECF No. 1 at 23, ¶¶ 3, 4. The District did not complete full psycho-educational testing in all areas of need until August 7, 2007. *Id.*, ¶ 5.<br><br>The district's school psychologists recognized that E.D.'s distractibility and attention difficulties may have resulted in an underestimate of E.D.'s cognitive abilities. *Id.*, ¶ 8. Unlike the private evaluator, the school psychologist did not use an instrument that would allow her to tease out these confounding factors. *Id.,* ¶ 15.<br><br>By delaying full psycho-educational testing notwithstanding recognition of E.D.'s academic challenges in all areas, the District did not *carefully* consider E.D.'s need in January 2007.<br><br>By failing to accurately assess E.D.'s intellectual ability, the District did not *carefully* consider E.D.'s present levels of achievement and potential for growth. |
| The IEP then sets out "measurable annual goals" designed to enable the child to be involved in and make progress in the general education curriculum. *Id.* (citing 20 U.S.C. § 1414(d)(1)(A)(i)(II), (IV)).<br><br>The school district must provide services (including specially designed instruction, supplementary aids and services, program modifications and supports for school personnel, based on peer-reviewed research to | Because the January 2007 evaluation was limited to speech and language, as opposed to all academic areas, her E.D. had only speech and language goals. *Op.* at 6, ECF No. 1 at 26, ¶ 23. Although these "skill areas affect development of early academic skills," *id.* at 23, they do not provide targeted instruction to enable progress in the general education curriculum in *all* academic areas of need. |

| | |
|---|---|
| the extent practicable) that enable the student to advance appropriately toward attaining meaningful annual goals, to be involved in and progress in the general education curriculum and to participate in extracurricular and nonacademic activities. 20 U.S.C. §§ 1414(d)(1)(A)(i)(IV), 1414(d)(3). | After the District finally completed a comprehensive evaluation in August 2007, the IEP contained goals for reading, math, written expression, attention/behavior, as well as speech/language. *Op.* at 7, ECF No. 1 at 27, ¶ 29. E.D. should have had those goals in place no later than March 2007.<br><br>By the end of kindergarten, E.D. could not meet the academic standards for math, reading and writing. *Op.* at 6, ECF No. 1 at 26, ¶ 27.<br><br>E.D.'s IEPs neither aimed for, nor resulted in, progress in the general education curriculum. In fact, she would have repeated first grade if she had stayed in the District for the 2008-2009 school year. |
| Evaluations and re-evaluations must assess the child in all areas of suspected disability; should be "sufficiently comprehensive to identify all of the child's special education and related service needs," and provide "relevant information that directly assists" in determining the child's educational needs. 20 U.S.C. §§ 1414(a)(1)(C)(i)(II), 1414(a)(2)(A), 1414(b)(2)(A)(ii), 1414(b)(3)(B); 34 C.F.R. §§300.304(c)(1)(ii—iv), (2), (4), (6), (7). | The district's initial evaluation in January 2007 was not sufficiently comprehensive.<br><br>By deleting certain information from the 2007 Reevaluation Report (a fact unknown to the hearing officer because of the District's incomplete response to parents' request for records), the District deprived parents and other members of the IEP Team of information directly relevant to E.D.'s educational needs. |

| The school district must plan for the student to make reasonable progress toward the goals in the student's IEP, and, if the student fails to make reasonable progress, must make changes in the goals or the services in the IEP to enable the student to make progress. 20 U.S.C. §§ 1414(c)(1)(B), 1414(d)(4); 34 C.F.R. § 300.324. | The District withheld information from parents (and consequently, that information was not available to the hearing officer) that demonstrated unequivocally that E.D.'s behaviors interfered with her instruction. Had the parents had access to that information at the time, they could have and would have sought more behavioral supports. Had the hearing officer been presented with the information, she likely would not have concluded that the teacher "successfully implemented" strategies to address E.D.'s behaviors. Thus, the record compels the conclusion that E.D.'s inattention and distractibility interfered with her ability to learn, the District did nothing to address those behavioral issues to ensure progress. The hearing officer's conclusion to the contrary, which was based on incomplete information, is not entitled to deference. |
|---|---|

The progress reporting for E.D.'s kindergarten year showed that in language-based skill areas, E.D.'s area of need, she made no progress during the 2006-2007 school year. *See Pl. Mem.* at 10, ECF No. 17 at 12. She was at a reading level of 0, which was "not proficient" for the end of kindergarten. *Id.* Because the District had not yet identified E.D.'s reading needs as part of her IEP, E.D. did not receive summer programming in this significant area of need during the summer of 2007. *Pl. Mem.* at 10-11, ECF. No. 17 at 12-13. Even more significantly, the District, for some reason, deleted the school psychologist's diagnosis of a specific learning disability in reading from the Reevaluation Report completed in the summer of 2007. *Pl. Mem.* at 12, ECF. No. 17 at 14. The District failed to address E.D.'s behaviors that interfered with the learning process. *Pl. Mem.* at 13-14, ECF. No. 17 at 15-16. At the end of the 2007-2008 school year (first grade year), objective testing revealed that E.D., a student of average intelligence with a specific learning disability in reading, had made *no progress* in her areas of need in the prior two years.

The proposal for the 2008-2009,[6] which should have been E.D.'s second grade year, placed E.D. in a classroom with only first grade peers. *Pl. Mem.* at 15-16, ECF. No. 17 at 17-18, ¶ 48. Thus, the program for 2007-2008, which the hearing officer conceded had low expectations, in fact resulted in so little progress that E.D. was effectively retained. The learning support teacher did not want the parents' expert to observe the classroom because it was bereft of second grade students, which would undermine the District's contention that E.D. had advanced appropriately pursuant to her 2007-2008 IEP. *Id.*, ¶ 48(e).

> ### 2. Because the District Withheld Pertinent Information from Parents, at the IEP Development Stage and During the Administrative Hearing, the District Deprived Parents of Meaningful Participation in the Process, Warranting Reversal of the Hearing Officer's Decision

*Endrew F.* recognizes that the "reasonably calculated" qualification "reflects a recognition that crafting an appropriate program of education requires prospective judgment by school officials." *Endrew F.*, at *21. But – and this is particularly significant in E.D.'s case – the IDEA contemplates that the "fact-intensive exercise [of developing an appropriate IEP] will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Id*. When a school district withholds pertinent information, parents cannot provide meaningful input. Thus, when formulating an IEP, a school district must ensure "that the process 'will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians.'" *M.C. v. Antelope Valley Union High Sch. Dist.*, No. 14-56344, 2017 U.S. App. LEXIS 5347, at *2 - *3 (9th Cir. March 27, 2017) (quoting *Endrew F.*, at *21). When a school district's actions vitiate the right of parental participation, it is a significant procedural violation with substantive ramifications. *Id.* It is difficult to imagine a justification for a school

---

[6] The 2008-2009 IEP called for placement for another year in a first grade learning support class.

district's failure to be forthright with the information in its possession. *Id.* at *11. Indeed, in *M.C.*, which applied *Endrew F.* in its discussion of the parental participation right, the court of appeals instructed the district court to determine whether the school district's "course of conduct was a deliberate attempt to mislead" the parent and, if it was, to "impose a sanction sufficiently severe to deter any future misconduct." *Id.* at *11 n.5.

*Endrew F.* recognizes the critical importance of full access to information for the parents involved in the IEP process. Although courts should not substitute their own notions of sound educational policy for school authorities, "deference is based on the application of expertise and the exercise of judgment by school authorities." *Id.* This is because IDEA vests educators "with responsibility for decisions of critical importance to the life of a disabled child." *Id.* The nature of the IEP process "from the initial consultation through state administrative proceedings" is such that parents and school representatives should "fully air their respective opinions on the degree of progress a child's IEP should pursue." *Id.*; *see also M.C., supra*, at *11 - *12 (Congress intended to give parent and guardians a large measure of participation <u>at every stage of the administrative process</u>").

In this case, the following actions of District personnel significantly impeded parental participation in the IEP process, from the beginning and through the administrative proceeding:

- In 2007, the school psychologist found that E.D. had a specific learning disability in the area of reading. For some unexplained reason, the District deleted that information from the Evaluation Report. (Parents could not inquire about it at the hearing because the District provided an incomplete response to parental requests for records.)

- As discussed more fully in *Pl. Mem.* at 13-14, ECF No. 17 at 15-16, ¶¶ 41(a)-h, 42, 43, the District withheld information relating to E.D.'s unaddressed behavioral challenges during the 2007-2008 school year interfering with access to her educational programming. The hearing officer, having no access to this information concluded that E.D.'s teacher "developed and successfully implemented behavior interventions." *Op.* at 7, ECF No. 1 at 27, ¶ 32. That

10

factual finding, made without access to information deliberately withheld by the District, is entitled to no deference. Indeed, the evidence is preponderant that E.D.'s attentional and behavioral issues did in fact interfere significantly with her educational programming during the 2007-2008 school year.

- Documents that the District deliberately withheld from the parents establish that E.D. did not make progress in social skills, contrary to the hearing officer's findings. Specifically, in response to an inquiry from the school psychologist, E.D.'s learning support teacher wrote that E.D. "cannot even handle the social demands of first grade." *Pl. Mem.* at 15, ECF No. 17 at 17, ¶ 47. The learning support teacher proposed retention in first grade "for social immaturity reasons." *Id.* at 15-16, ECF No. 17 at 17-18, ¶ 48(a).

- Documents that the District deliberately withheld from the parents undermine the hearing officer's finding regarding the occupational therapist knew E.D.'s needs and provided strategies to address them. *Id.* at 16-17, ECF No. 17 at 18-19, ¶¶ 49-50.

These violations significantly impeded parental participation in both the IEP process and the administrative proceeding, and in and of themselves warrant a reversal of the hearing officer's decision.

## IV. CONCLUSION

"The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F.*, at *28. For a child of average intelligence with a specific learning disability, this "typically means . . . providing a level of instruction reasonably calculated to permit advancement through the general curriculum." *Id.* at *25. Even though she used the phrases "significant learning" and "meaningful benefit," the hearing officer did not apply the standard articulated by *Endrew F*. She found that Colonial School District complied with the IDEA by providing programming designed to provide "more than trivial or *de minimis*" progress that was, by the hearing officer's own admission, not aligned to grade level expectations. She also erred in finding that the trivial (or non-existent) progress that E.D. made was appropriate.

Additionally, the District repeatedly violated the parents' and E.D.'s rights by failing to provide information directly relevant to E.D.'s educational needs. Because of these violations, parents were unable to present, at the hearing, information that seriously undermines some of the hearing officer's factual determinations. For this reason as well, *Endrew F.* compels reversal of the decision.

REISMAN CAROLLA GRAN LLP

Date: March 30, 2017    s/ Catherine Merino Reisman
            Catherine Merino Reisman
            PA I.D. No. 57473
            19 Chestnut Street
            Haddonfield, NJ 08033
            856.354.0021 t
            856.873.5640 f
            catherine@rcglawoffices.com

            Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| E.D., *et al.*, <br> Plaintiffs, <br> v. <br> Colonial School District, <br> Defendant. | Civil Action <br><br> No. 09-cv-4837 <br><br> Surrick, J. |

## CERTIFICATE OF SERVICE

I, Catherine Merino Reisman, hereby certify that on this date I electronically filed the attached Supplemental Memorandum, which is available for viewing and downloading from the ECF system, and served it upon the following counsel of record by electronic mail:

> Karl A. Romberger, Jr., Esquire
> Sweet, Stevens, Katz & Williams
> 331 E. Butler Avenue
> New Britain PA 18901
> kromberger@sweetstevens.com

Dated: March 30, 2017                         */s/ Catherine Merino Reisman*